[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 16, 2010
JOHN LEY
CLERK

_____

No. 08-17077

_____

D. C. Docket No. 08-00010-CR-HLM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VAN BUREN LEE,
a.k.a. Doc,
a.k.a. jazzbassist@myway.com,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 16, 2010)

Before TJOFLAT, PRYOR and MARTIN, Circuit Judges.

PRYOR, Circuit Judge:

The question presented by this appeal is whether sufficient evidence

supports the convictions of Van Buren Lee for attempted enticement of a minor, 18 U.S.C. § 2422(b), attempted production of child pornography, id. § 2251(a), (e), and knowing receipt of child pornography, id. § 2252A(a)(2)(A). For several months, Lee communicated online with a postal inspector who was posing as "Candi Kane," the "open-minded mother of two beautiful [minor] girls." Lee and Candi repeatedly discussed whether, how, and when Candi would grant Lee sexual access to her daughters, and Lee produced and sent Candi and her daughters sexually explicit images of him. Eventually Lee and Candi spoke by telephone. Lee also requested that Candi produce and send to him sexually explicit photographs of her daughters in specific poses, which, so far as Lee knew, she did. Lee argues that he communicated only with an adult intermediary, he attempted to exploit only fictitious minors, he lacked the intent necessary to support his convictions, and his alleged speech without conduct did not establish the attempt crimes. We affirm.

## I. BACKGROUND

At least as early as 2006, Jude Densley, a federal postal inspector, began investigating online predators. Densley created a profile on the social networking website hi5 using the pseudonym "Candi Kane." According to her profile, Candi was an "open-minded mother of two beautiful girls," ages seven and twelve. The

2

profile also identified Candi as a member of online social groups called "Young Girls and Older Men Loving Each Other," "Dady's [sic] Favourite," and "Family Love is Best." At trial, Densley explained that the phrase "family love" is a euphemism for incest.

In September 2007, Lee, using the pseudonym "Doc," contacted Candi via hi5. In his first message to Candi, Lee stated, "I'm your man to handle all your needs." Lee closed his message by telling Candi to "[t]ake care . . . you and the girls."

On October 3, 2007, Lee and Candi interacted in two separate online conversations. During the first conversation, Lee asked Candi, "What's your sexual orientation and how old are your girls?" Lee asked Candi why she described herself in her profile as open minded and explained that he wanted to know more about Candi because "[t]here are a lot of things the police use the computer for these days to trap people if you know what I mean." Candi assured Lee that she was not a police officer and told him that when she was a child she was involved in a "loving sexual relationship" with her father. Lee responded by asking Candi if she wanted "[her] girls to learn the right way." Lee explained, "All I know is I love giving and receiving and I believe [in] giving 'til you reach orgasm. Can you handle that? Is that what you want for the girls too?" In the

3

second online conversation, Lee again expressed his concern that Candi was a police officer. Lee explained that he had been charged once with a sex crime against a child. Candi had not mentioned her daughters during this conversation, but Lee explained that he feared "talk[ing] to [Candi] . . . about sex . . . especially concerning [her] daughters." Without prompting, Lee repeatedly asked her whether she wanted to "teach" her daughters in the same way that she had been "taught" when she was a child. Toward the end of the second conversation, Candi told Lee that she was "seeing someone [] so if you are really looking for your soul mate or something like that, maybe I'm not the one you should be talking with." At trial, Densley explained that she told Lee that Candi had a boyfriend to determine whether Lee was interested in Candi or Candi's daughters.

Because she was managing other investigations, Densley did not use Candi's hi5 account for nearly two months, but when Densley used the account again in December 2007, Lee contacted Candi. Lee told Candi that since they had last communicated, he had purchased a new motorcycle. Lee stated his belief that the only thing better than a motorcycle is "helping a young lady become a woman." Lee then told Candi that in September he had almost helped a young lady become a woman when "a friend of [his] turned [him] on to her [eleven-year-old] granddaughter." When Candi asked what had happened, Lee told her that there

4

had been "a little touching and being nude around each other," but that he had not

had "enough time to go all the way." Lee explained, "You should never rush

things like that . . . only on her terms. Anyway she moved to another state."

Lee then again asked Candi how old were her daughters, and Candi

answered that they were now eight and thirteen. Lee asked Candi whether she

"would let him bring [her] children into womanhood." Lee explained, "I've never

had a virgin and chances are I probably never will, but if I had a woman I could

trust that is willing to help me out I might take her up on it." Candi told Lee that

she would consider providing him with sexual access to her daughters if she could

trust him and he agreed not to harm them. Lee told Candi that he wanted to meet

her daughters and asked if he could do so "any time soon." Lee then asked Candi

whether she was serious about providing access to her daughters. Candi assured

Lee that she was serious and asked whether Lee was serious or whether this was all

"just like fantasy chat." Lee responded, "I am very serious and that's why I'm

trying not trying [sic] to fall into a trap. . . . No my love, I am not into just online

chatting/fantasy." Lee then asked Candi if they could speak on the telephone and

whether she had "an age in mind for the girls to be deflowered or is now the time."

Lee and Candi communicated online again in December. Lee initiated the

conversation and asked Candi how she was. Candi told him that she was fine, and

5

Lee replied, "Good to hear that you're doing fine . . . how are my little darlings?  If you don't mind me addressing them as such."

Unprompted, Lee offered to send Candi a photograph of his penis from his cellular telephone to her email address.  Candi agreed to accept the photograph, and Lee then asked—again, unprompted—whether Candi would send him a revealing photograph of her and her daughters.  Candi explained that she did not have any revealing photographs but told Lee "I guess I could take some if you want."  Lee answered, "I'd like that if it's not too much to ask."  Candi asked Lee what sort of photographs he wanted, and Lee provided detailed specifications: "I'd like to see opened legs while laying on your back and doggie style with cheeks being held open with your hands."

Lee then sent a photograph of his penis to Candi's email account.  After he confirmed that Candi had received the photograph, Lee asked whether Candi was going to show the photograph to her daughters.  Lee told Candi that he wanted her to share the photograph with her daughters because "[t]hey are part of this too aren't they?" and "it's only fair for them to see what they may be getting."  Candi expressed her concern that Lee's penis was too large for her daughters, and Lee explained, "Yeah if I'm going to act like some mad man.  It's about taking my time and lots of lubrication. . . . This is about helping them into womanhood, not a

6

fu*****."

Lee then gave Candi his telephone number and asked her to call him. Lee explained, "I'm ready to make a trip out to meet you guys." Lee also asked Candi when he would receive the photographs that she had promised and stressed that he wanted to see both Candi and her daughters in the photographs. Candi assured Lee that she would take and send the photographs, and Lee replied, "Ok that sounds good. Candi I'm serious about this." Before signing off, Lee again told Candi that he wanted to know what her daughters thought of the photograph of his penis.

Lee emailed Candi on December 25, 2007. Lee told Candi that he was nervous about their last conversation and that he would feel better once she had "fulfill[ed] [her] end of the deal" by sending him photographs of her and her daughters. Lee explained that he was afraid of being arrested. The next day, Candi asked Lee how many photographs he wanted her to send. Lee stated that he wanted two each of Candi and her daughters. Lee asked Candi whether her daughters had agreed to pose as he had requested and he also asked again whether Candi had shown her daughters the photograph of his penis. Candi said that she had shown the girls the photograph and Lee asked how the girls had responded. Lee also asked again that he and Candi speak on the telephone. Candi again expressed her concern about the size of Lee's penis, and Lee sought to assuage her

7

fears: "Candi just know I'm going to be very, very gentle. . . . Please know, your babies are my babies too . . . and I truly mean that." Lee also said that he wanted to meet Candi and her daughters at their home to help Candi's daughters to feel more comfortable with him.

Lee and Densley, posing as Candi. finally spoke on the telephone on December 27, 2007, and Densley recorded the call. Lee and Candi discussed the possibility of Lee visiting Candi and her daughters in California. Lee suggested a visit in October 2008, and he and Candi discussed which airport was closest to Candi's home. Lee and Candi also discussed how Candi should send Lee the photographs that he had requested.

In a January 2008 online conversation, Lee asked Candi whether she had taken the photographs that he had requested. During another conversation in January 2008, Candi told Lee that she and her daughters "took the pictures you wanted over the weekend." Lee responded, "Wow, that's wonderful!" Lee stated, "[T]hanks for doing that for me . . . it means a lot."

Lee and Candi continued to discuss the possibility of Lee visiting Candi and her daughters in California. At the end of January, Lee asked Candi how she planned to bring him "into the picture" in the light of her having a boyfriend. Candi explained that they could meet when her boyfriend was out of town, and Lee

8

asked, "So will I be visiting your home?" Candi and Lee discussed Lee having sex with her daughters. Candi made clear that she was not interested in having sex with Lee as part of a "group thing." Lee agreed that he is "not into group stuff. [He] agree[d] [that] it should be one on one and very special." Lee then asked whether Candi's older daughter was menstruating and whether she was taking birth control pills. Lee explained, "I have to tell you I'm not a condom user."

On February 15, 2008, Lee and Candi again communicated online and discussed the possibility of Lee having sex with Candi's daughters. Lee told Candi that if he had been with her and her daughters "[t]onight would have been the night to turn [your daughters] into women, and you, well just feeling like the queen you are." Lee then invited Candi to watch a live video stream of him; Candi accepted and watched Lee masturbate. At the end of the conversation, Lee signed off and told Candi, "Tell the girls I send my lov[e]." Later that month, Lee asked Candi what the future held for "me, you, and the girls?" Candi suggested that Lee send presents to her daughters so that they could become familiar with him.

During a later online conversation, Candi again clarified that she was not interested in a sexual relationship with Lee and asked whether Lee would still be interested in "teaching" her daughters if he could not have sex with Candi. Lee again clarified that he was interested in having sex with only Candi's daughters.

9

Lee also stated that he was willing to give Candi his home address so that she could send him the photographs that he had requested and suggested that they meet after he received them. Lee specifically suggested that he meet Candi and her daughters during the summer because the girls would be out of school. Lee said that he could fly to Utah and then drive to meet Candi and her daughters in California. At the end of this conversation, Lee gave Candi his address in Rockmart, Georgia, and asked that if she were involved with the police, she "lose" his address. The next day Lee chatted with Candi and tried to show her his penis in another live video feed. Lee asked Candi whether she had been discussing him with her daughters and asked what kinds of gifts he should send the girls. Candi gave Lee her address at a post office box, and Lee promised that he would send gifts after he received a check the following month.

Candi and Lee continued to communicate in March 2008. During one conversation, Candi told Lee that she had mailed him the photographs that he had requested. Lee told Candi that he had been looking for gifts for her daughters. He asked if either of the girls liked Barbie dolls and said that he had been looking at coloring books and necklaces as possible gifts.

Candi and Lee last communicated on March 7, 2008. On that day, a postal inspector in Georgia who had been working with Densley arranged to have

10

government agents deliver to Lee a package that purported to contain photographs of Candi and her daughters. The package contained photographs of minors in sexually explicit poses. While Candi and Lee were conversing online on March 7, Lee exclaimed, "I think the mail just arrived!" Lee asked Candi to wait while he retrieved the mail. When Lee retrieved the package of child pornography from his porch, he was arrested. Candi never again heard from Lee.

In March 2008, a federal grand jury returned a three-count indictment against Lee. Count one alleged that Lee had attempted to use, persuade, induce, entice, and coerce a person under the age of eighteen to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, 18 U.S.C. § 2251(a), (e). Count two alleged that Lee had knowingly received child pornography, id. § 2252A(a)(2)(A). Count three alleged that Lee had attempted to persuade, induce, entice, and coerce an individual under the age of eighteen to engage in child molestation, as defined by section 288 of the California Penal Code, id. § 2422(b). After trial, a jury convicted Lee on all three counts.

The district court sentenced Lee in December 2008. The presentence investigation report provided a total offense level of 41 and a criminal history of V. Lee's criminal history included three adult convictions. In 1980, Texas police investigated a report that Lee had exposed himself to a nine-year-old child. The

11

investigation revealed that Lee had exposed himself to several other individuals during the preceding year: an adult female on a naval base in October 1979; a neighbor in January 1980; and a neighbor's twelve-year-old daughter in March 1980. A Texas jury convicted Lee of indecent exposure and Lee received a sentence of four years of probation. In October 1998, a Georgia jury convicted Lee of molesting his second wife's daughter—whom Lee had adopted—when the girl was under the age of sixteen. According to the investigation reports, Lee had exposed himself to the girl on several occasions. Lee's wife also caught him using a mirror to look underneath the bathroom door while his adopted daughter was showering. Moreover, in March 1997, while the girl was cooking, Lee exposed his genitals to her and touched her buttocks several times. For this conviction, Lee served five years in prison and began serving a five-year sentence of probation in October 2003. The terms of Lee's probation required him to, among other things, "not violate the criminal laws of any governmental unit," "not purchase or possess any pornographic, sexually explicit or stimulating material," and "not initiate contact with nor continue uninitiated contact with a child under the age of 16." Lee violated the terms of his probation in 2005 when he committed criminal trespass. Georgia police, responding to an anonymous tip, discovered Lee in an abandoned house, which was located across the street from a playground. Lee had

12

a set of binoculars and had been watching the playground. After considering the advisory guidelines range and the sentencing factors set out at 18 U.S.C. § 3553(a), the district court sentenced Lee to a term of imprisonment of 300 months on each of the three counts, to be served concurrently. The district court sentenced Lee below the advisory guidelines range and at the statutory mandatory minimum for his conviction of attempted production of child pornography.

## II. STANDARD OF REVIEW

"We review a verdict challenged for sufficiency of the evidence de novo, resolving all reasonable inferences in favor of the verdict." United States v. Yost, 479 F.3d 815, 818 (11th Cir. 2007). "We cannot disturb the verdict unless no trier of fact could have found guilt beyond a reasonable doubt." Id. at 818–19 (internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion of Lee's arguments into two parts. First, we explain and reject Lee's argument that he could not have violated either section 2422(b) or section 2251(a) and (e) because he communicated with an adult intermediary and attempted to exploit two fictitious minor girls. Second, we explain that a reasonable jury could have found that Lee committed the offenses charged in the indictment.

13

*A. Lee Need Not Have Communicated Directly with a Minor or Attempted to Exploit Real Minors.*

On appeal, for the first time, Lee presents two arguments against his convictions under sections 2422(b) and 2251(a) and (e). First, he argues that he could not have violated either statute by communicating only with an adult intermediary, instead of actual or purported minors. Lee argues that the "plain language of the statute[s] covers persuasion, inducement, enticement and coercion of a minor, not an adult who controls the behavior of the minor." According to Lee, if he did anything, he attempted to persuade only Candi, an adult, to provide access to her daughters and to produce child pornography. Second, he argues that he could not possibly have violated either statute because "there were no actual children in this case." These arguments fail.

Lee could have been convicted under section 2422(b) even though he communicated only with an adult intermediary. As Lee concedes, we have squarely rejected the argument that "because [the defendant] did not directly communicate with a minor or a person he believed to be a minor, his conduct was not criminally proscribed by the language of § 2422(b)." United States v. Murrell, 368 F.3d 1283, 1285 (11th Cir. 2004); see also United States v. Searcy, 418 F.3d 1193, 1194 & n.1 (11th Cir. 2005); United States v. Hornaday, 392 F.3d 1306, 1309–10 (11th Cir. 2004). In Murrell, we concluded that the conduct of a

14

defendant who communicates only with an adult intermediary "fits squarely within the definition of 'induce.'" 368 F.3d at 1287. We might also have explained that one can persuade, entice, or coerce a minor to engage in sexual activity through an adult intermediary because "[s]exual predators can and do . . . attempt to persuade children to engage in sexual activity through the victim's parents or guardians." United States v. Nestor, 574 F.3d 159, 161–62 & n.4 (3d Cir. 2009); see also United States v. Spurlock, 495 F.3d 1011, 1013–14 (8th Cir. 2007). No matter the rationale, section 2422(b) prohibits Lee's conduct.

The same is true of Lee's conviction under section 2251(a) and (e). Sections 2422(b) and 2251(a) and (e) proscribe related conduct. Section 2422(b) proscribes attempting knowingly to "persuade[], induce[], entice[], or coerce[] [a minor] to engage in . . . any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2422(b). Section 2251(a) and (e) prohibits the same conduct when the defendant's object is to produce pornography with the minor rather than to engage in sexual activity with the minor. Id. § 2251 (a), (e) ("Any person who . . . persuades, induces, entices, or coerces any minor . . . ."). In the light of this similarity, and the holding of Murrell, the district court did not err in applying section 2251(a) and (e) to Lee. Moreover, even without Murrell, the district court would have been right to apply section 2251(a) and (e) to an

15

individual who, like Lee, attempted to produce child pornography by communicating with only an adult intermediary. Section 2251(a) and (e), unlike section 2422(b), prohibits attempting to "employ[] [or] use[]" a minor for the purpose of producing child pornography. Id. Lee's argument against the application of section 2422(b) to individuals who communicate only with an adult intermediary—that each of the verbs of section 2422(b) contemplates direct interaction with a minor aimed at oral persuasion—does not apply to section 2251(a) and (e).

Lee also could have been convicted under section 2422(b) even though he attempted to exploit only fictitious minors. As Lee acknowledges, we have held that section 2422(b) does not require an actual minor victim. Yost, 479 F.3d at 819 n.2; United States v. Root, 296 F.3d 1222, 1227 (11th Cir. 2002); see also United States v. Pierson, 544 F.3d 933, 939 (8th Cir. 2008). Although Root and Yost involved defendants who communicated with individuals who they believed to be, but were not, minors, Lee does not explain why his argument is stronger because he communicated only with the mother of two fictitious minors. Because of the material similarity of sections 2422(b) and 2251(a) and (e), Lee's argument against his conviction under section 2251(a) and (e) for attempting to use a fictitious minor to produce pornography also fails.

16

*B. Sufficient Evidence Supports Each of Lee's Convictions.*

Lee argues that sufficient evidence does not support any of his three convictions. Sufficient evidence supports Lee's convictions if a reasonable jury could have found beyond a reasonable doubt that Lee "(1) had the specific intent or mens rea to commit the underlying charged crimes, and (2) took actions that constituted a substantial step toward the commission of [each] crime." Yost, 479 F.3d at 819 (alteration in original) (internal quotation marks omitted). We have explained that a defendant takes a substantial step toward completing a crime when his "objective acts mark his conduct as criminal and, as a whole, strongly corroborate the required culpability." Id. (internal quotation marks omitted).

Lee presents two arguments about the sufficiency of the evidence. First, with respect to all of his convictions, he argues that the government failed to prove that he intended "to engage in illicit sexual conduct with minors." According to Lee, the evidence adduced at trial showed that he was interested only in Candi and expressed sexual interest in her daughters only to keep her interested in him. Second, with respect to his attempt convictions under sections 2422(b) and 2251(a) and (e), Lee argues that the government proved that he engaged in nothing more than "explicit sexual banter" and that "speech without conduct does not establish the crime of attempt." We address each conviction in turn.

17

1. Sufficient Evidence Supports Lee's Conviction Under Section 2422(b).

We must first decide what the government had to prove at trial to convict Lee of attempted enticement because the parties disagree on the matter. The parties do not dispute that we must sustain Lee's conviction if a reasonable jury could have found that he took a substantial step toward achieving the end that section 2422(b) proscribes, with the intent that he achieve that end, but they disagree about what end section 2422(b) proscribes. Lee argues that the government had to prove that he "intended to travel to California to engage in sexual acts with the children." The government argues that it satisfied its burden by proving that Lee attempted to persuade Candi's daughters to agree to engage in sex acts. We agree with the government.

We have explained what the government must establish to prove a violation of section 2422(b) when a defendant communicates directly with the target minor. With regard to intent, the government must prove that the defendant intended to cause assent on the part of the minor, not that he "acted with the specific intent to engage in sexual activity." Yost, 479 F.3d at 819 n.3; see also Pierson, 544 F.3d at 939; United States v. Dwinells, 508 F.3d 63, 71–72 (1st Cir. 2007); United States v. Thomas, 410 F.3d 1235, 1244 (10th Cir. 2005); United States v. Bailey, 228 F.3d 637, 639 (6th Cir. 2000). With regard to conduct, the government must prove

18

that the defendant took a substantial step toward causing assent, not toward causing actual sexual contact.  See Yost, 479 F.3d at 819–20 & n.3; Murrell, 368 F.3d at 1286; see also United States v. Goetzke, 494 F.3d 1231, 1236 (9th Cir. 2007). Section 2422(b) "expressly proscribe[s] . . . the persuasion, inducement, enticement, or coercion of [a] minor" to engage in illicit sexual activity, and not the sexual activity itself.  Murrell, 368 F.3d at 1286.  The statute "criminalizes an intentional attempt to achieve a mental state—a minor's assent."  Dwinells, 508 F.3d at 71.

Lee has offered no reason, and we can think of none, why the burden of proof for the government should change when a defendant, like Lee, communicates only with an adult intermediary who can influence a minor.  "Congress has made a clear choice to criminalize persuasion . . . , not the performance of the sexual acts themselves."  Bailey, 228 F.3d at 639.  We will uphold Lee's conviction if a reasonable jury could have found that Lee intended to cause Candi's daughters to assent to sexual contact with him and that Lee took a substantial step toward causing that assent.  Viewing the burden of the government in this way, we conclude that a reasonable jury easily could have convicted Lee of violating section 2422(b).

The record contains ample evidence that Lee intended to cause Candi's

19

fictitious daughters to assent to sexual contact with him. The government presented evidence that Lee was interested in Candi's daughters, not Candi. In his conversations with Candi, Lee repeatedly stated that he was interested in Candi's daughters and not Candi, who professed to be in another relationship. The jury was free to accept Lee's statements as true. A reasonable jury also could have found from Lee's constant concern for whether Candi was participating in a sting that Lee was interested in more than a relationship with Candi; a relationship with Candi, an adult, would not have concerned law enforcement. See Pierson, 544 F.3d at 939. Although Lee testified at trial that he was sexually interested only in Candi and not her daughters, the jury could have rejected this testimony and found that Lee was interested in Candi's daughters. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995).

A reasonable jury also could have found that Lee sought to have Candi's daughters assent to a future sexual encounter and that he was not interested in forcing them to participate unwillingly. Lee encouraged Candi to share a photograph of his penis with her minor daughters and repeatedly asked how the girls responded to seeing the photograph. He promised to buy gifts for the girls and assured Candi that he would not harm the minor girls during intercourse. Lee also suggested that he meet the girls at their home before any sexual encounter so

20

that they would feel more comfortable around him. Lee took steps to ensure that Candi's daughters would welcome any future sexual encounter.

A reasonable jury also could have found that Lee took a substantial step toward causing Candi's daughters to assent to sexual contact with him. Lee's internet and telephone "conversations . . . went beyond mere preparation," and constitute a substantial step sufficient to support his attempt conviction. Spurlock, 495 F.3d at 1014. Lee did not confide in a friend or write in his journal about his desire to have sex with Candi's daughters; he requested assistance from the one woman who had "influence and control over [the] daughters." Id. Lee did more than suggest the possibility of having sex with Candi's daughters. Over the course of several months, he repeatedly discussed when and, in graphic detail, how he wanted to complete the act. See Nestor, 574 F.3d at 161; Bailey, 228 F.3d at 640; cf. Yost, 479 F.3d at 820. Much of Lee's conduct—especially his sending graphic photographs to the girls and promising gifts—also supports a finding that he groomed the girls in an effort to facilitate a future sexual encounter. See United States v. Brand, 467 F.3d 179, 203 (2d Cir. 2006). Lee stresses that he never made final plans to travel to California from Georgia to meet Candi and her daughters, see Murrell, 368 F.3d at 1288 n.3, but the government charged Lee with "an attempt to achieve the mental act of assent, for which physical proximity . . . is not

21

required." Goetzke, 494 F.3d at 1236. We will not require firm plans to travel where, as here, the defendant, for several months, took other steps sufficient to achieve the end that is the object of the attempt.

The dissent contends, without providing any support, that the government was required to prove that Lee "took a substantial step towards stimulating the occurrence of his intended goal of having sex with a child," and that Lee must have taken "a step to extend his relationship with Candi Kane or her daughters beyond the boundaries of his property in Georgia." But as we have explained, our precedent and the precedents of many of our sister circuits hold that section 2422(b) prohibits attempts to cause minors to agree to engage in illegal sexual conduct, not attempts to engage in illegal sexual conduct with minors. See Yost, 479 F.3d at 819–20 & n.3; Pierson, 544 F.3d at 939; Dwinells, 508 F.3d at 71–72; Thomas, 410 F.3d at 1244; Bailey, 228 F.3d at 639. As we stated in Yost, "[W]e are not required to find Yost acted with the specific intent to engage in sexual activity." 479 F.3d at 819 n.3. These decisions could not be any clearer: section 2422(b) does not require proof of an attempt at child molestation.

Murrell does not contradict these decisions by holding that the government must prove an attempt at child molestation to sustain a conviction under section 2422(b). We have explained that "the holding of a case is, as the Supreme Court

22

observed, comprised both of the result of the case and 'those portions of the opinion necessary to that result by which we are bound.'" United States v. Kaley, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) (quoting Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66–67, 116 S. Ct. 1114, 1129 (1996)).  The holding of Murrell is that a reasonable jury could have found that Murrell attempted to "induce" a minor to engage in sexual activity with him because he "attempted to stimulate or cause the minor to engage in sexual activity with him."  368 F.3d at 1287.  Although we elected to "view Murrell's actions as those of inducement rather than persuasion, enticement, or coercion," id., that choice does not affect this appeal.  So far as this appeal is concerned, what matters is that the grand jury indicted Lee for an attempt to "persuade, induce, entice, and coerce" a minor to engage in child molestation.

The dissent states that none of our precedents upheld a conviction where the defendant "made so little effort to consummate the crime," but our aim is not to decide whether Lee's conduct is at least as "criminal" as the conduct of others convicted under section 2422(b).  Each of our precedents holds no more than that a reasonable jury could have found that the defendant at issue violated section 2422(b).  Not surprisingly, none guesses at or purports to have identified the minimum conduct that section 2422(b) proscribes.

23

Yost makes clear that we are to consider the "totality" of Lee's conduct to determine whether the record supports a finding that he "committed a substantial step" toward persuading or enticing a minor to engage in a sex act. 479 F.3d at 820. The "totality" of Lee's conduct includes the following acts:

(1) initiating contact with Candi, who he believed to be interested in providing others with sexual access to her daughters;

(2) asking more than once whether Candi was a police officer and expressing his concerns about falling into a trap;

(3) during a conversation several months later, asking Candi whether she "would let him bring [her] children into womanhood";

(4) explaining that he had recently almost brought an eleven year old girl "into womanhood," but failed because he did not want to rush things and the girl eventually moved away;

(5) asking if he could meet Candi's daughters "any time soon" and asking whether Candi had "an age in mind for the girls to be deflowered or is now the time";

(6) sending a photograph of his penis to Candi, asking more than once that she share it with her daughters, and promising that his penis is not so large as to harm the girls;

(7) when he learned that the girls had seen the photograph, asking Candi how the girls had responded;

(8) requesting, more than once, from Candi photographs of the minor girls with "opened legs while lying on your back and doggie style with cheeks being held open with your hands";

(9) insisting, "I'm serious about this";

24

(10) giving Candi his phone number and asking that she call him;

(11) telling Candi that he was "ready to make a trip out to meet you guys," and later saying he wanted to meet the girls in their home so that they would feel comfortable around him;

(12) discussing with Candi travel details including easiest travel route and meeting in the summer when the girls would be out of school;

(13) speaking with Candi on the telephone and discussing when and how he might travel to California to meet the girls;

(14) again discussing with Candi his visiting the girls in California and discussing details, including his concern that Candi's boyfriend would complicate the plan;

(15) on more than one occasion, insisting to Candi that he was not interested in having sex with anyone other than the minor girls;

(16) asking Candi whether the oldest girl was menstruating and, if so, whether she was taking birth control pills because he is "not a condom user";

(17) inviting Candi to watch a live video stream of him masturbating, masturbating while Candi watched, and ending the event by "send[ing] [his] lov[e]" to the girls;

(18) later inviting Candi to watch a similar stream;

(19) promising to send gifts to the girls;

(20) in another conversation, promising that he had been shopping for coloring books, dolls, and necklaces;

(21) continuing to communicate with Candi after she told him that she had created and mailed him pornographic pictures of her minor daughters;

(22) excitedly accepting what he believed to be pornographic photographs of the minor girls;

25

ending his pursuit of Candi's minor daughters only upon his arrest. The evidence of "[t]hese acts, taken as a whole," allowed the jury to find that Lee's "conduct was criminal." Id.

We also reject the dissent's reading of the jury instruction; neither party has raised an issue about the jury instruction and for good reason. In Yost, the government requested the same charge from the district court that it requested here, and we affirmed Yost's conviction because we concluded that the jury could have found that Yost attempted to cause the target minors to assent to illegal sexual conduct. Id. at 819–20 & n.3. In this case, the district court instructed the jury that the indictment charged Lee with attempting to "persuade, entice, induce a minor to engage in criminal sexual activity," which is an entirely accurate description of the indictment and the law. The district court also instructed the jury that "it's not necessary for the [g]overnment to prove that the individual was actually persuaded or induced or enticed to engage in sexual activity," which again is an entirely accurate statement of the law. The district court next instructed that the government must "prove that the defendant intended to engage in some form of unlawful sexual activity with an individual," but when read in context, this instruction explained nothing more than that Lee must have intended to convince Candi's fictitious daughters to engage in unlawful sexual activity and not, for

26

instance, a trip to an amusement park. Viewed in the light most favorable to the government, Lee's actions, "taken as a whole, strongly corroborate [his] culpability and provide clear evidence that his conduct was criminal." Id. at 820.

2. Sufficient Evidence Supports Lee's Conviction Under Section 2251(a) and (e).

Lee's argument with respect to his conviction of attempted production of child pornography is identical to his argument with respect to his conviction of attempted enticement. He urges that no reasonable jury could find that he was interested in producing or viewing photographs of Candi's daughters; he was interested only in Candi. He argues also that he engaged in only "explicit sexual banter" with Candi, which he urges cannot constitute a substantial step toward violating section 2251(a) and (e). The similarity of sections 2422(b) and 2251(a) and (e) notwithstanding, the parties agree as to what the government must have proved to support a conviction for attempted production of child pornography: that Lee intentionally attempted to use Candi's daughters to produce child pornography. We conclude that the government satisfied its burden.

A reasonable jury could have found that Lee intended to use Candi's daughters in the production of child pornography. Lee actively planned the production of photographs that depicted Candi's minor daughters in graphic sexual poses. He described how many photographs he wanted of each girl, how he

27

wanted the girls to pose, and provided his home address so that he could view the finished product. A reasonable jury could have found that Lee's concern for whether Candi was a law enforcement agent proved that he was interested in using her minor daughters to produce pornography, which is a crime. See Pierson, 544 F.3d at 939. A reasonable jury also could have disbelieved Lee's testimony that he was not interested in Candi's daughters in any way and found that he was in fact both interested in Candi's daughters and interested in producing photographs of them. See Brown, 53 F.3d at 314.

A reasonable jury also could have found that Lee took a substantial step toward using Candi's daughters to produce child pornography. Lee repeatedly attempted to initiate the production of child pornography by requesting sexually explicit photographs and sending a photograph of his own. He then directed the creation and distribution of specific photographs that, so far as he knew, Candi created and sent to his home in Georgia. A reasonable jury could have found that Lee attempted to produce child pornography with Candi and her daughters.

3. Sufficient Evidence Supports Lee's Conviction Under Section 2252A(a)(2).

Lee challenges his conviction for knowingly receiving child pornography by arguing that he did not believe that he was receiving child pornography. The government did not charge the offense as an attempt because Lee received a

28

package of child pornography. We agree with Lee and the government that section 2252A(a)(2) requires that he believed that the package that he received at his home in March 2008 contained child pornography. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) Offense Instruction 75.4 (2003).

A reasonable jury could have found that Lee believed that he had received child pornography. Lee believed that Candi had produced sexually explicit photographs of her daughters and mailed them to his home in Georgia from her home in California because she told him that she did, and he was elated at the news. Lee had attempted, for several months, to convince Candi and her minor daughters to produce and send him sexually explicit photographs of the daughters. Lee clearly believed that Candi's daughters were minors. When his mail arrived on March 7, 2008, Lee eagerly left an online conversation with Candi to retrieve his package. A reasonable jury could have found from this evidence that Lee believed that he had received child pornography.

## IV. CONCLUSION

We **AFFIRM** Lee's convictions.

29

MARTIN, Circuit Judge, concurring in part, and dissenting in part:

I concur with the reasons given by the majority for affirming Mr. Lee's conviction for receiving child pornography and for attempting to produce child pornography. However, I write separately, and in dissent, because I do not believe the evidence supports Mr. Lee's conviction for attempting to entice a child to engage in illicit sexual activity, even when all inferences are made on the side of the government. In order for a person to be convicted of attempting to commit a crime, he must not only intend to commit the crime, he must also take a substantial step towards committing it. I believe the evidence against Mr. Lee fails on the substantial step requirement.

Because I address only whether the evidence presented at trial was sufficient to sustain Mr. Lee's conviction under 18 U.S.C. § 2422(b), I confine my discussion to the evidence actually presented to the jury. The majority opinion includes information from the Presentence Report — a court document prepared *after* Mr. Lee's trial and conviction. The court's probation officer prepared the Presentence Report and provided it to the district judge, under seal, as an aid in sentencing. The jury never saw nor had any knowledge of the information revealed about Mr. Lee's past. While the majority's recitation of Mr. Lee's prior convictions and alleged past conduct certainly casts an ugly light on Mr. Lee's character, sound

30

policies caution against relying on these incidents when evaluating Mr. Lee's culpability in this case. Mr. Lee was not on trial for those admittedly perverse acts, and the bottom line is, of course, that the Presentence Report was not evidence in this case. In any event, I do not undertake to debate the manner in which Mr. Lee has chosen to live his life. I only mean to address the standard for what is legally required to convict any defendant of the crime of attempt.

As set forth by the majority, Mr. Lee communicated with United States Postal Service Inspector Jude Densley, known to him as Candi Kane, over a period of about six months. Candi Kane told Mr. Lee she was the mother of two girls, ages seven and twelve, living in California. Mr. Lee was in Georgia. It is not disputed that Mr. Lee never took any step, substantial or otherwise, to travel to California. He never bought a plane, bus or train ticket. He never set a date for a visit. He never left Georgia.

In order "[t]o sustain [Mr. Lee's] convictions, we must determine he (1) had the specific intent or mens rea to commit the underlying charged crimes, and (2) took actions that constituted a substantial step toward the commission of [each] crime." United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (citation and internal quotation marks omitted). Precedent requires us to pay close attention to both requirements for an attempt conviction. We have said that the second element

31

of an attempt charge—whether the defendant took a substantial step—requires the government to prove beyond a reasonable doubt that "the defendant's objective acts, without reliance on the accompanying mens rea, . . . mark the defendant's conduct as criminal." United States v. Carothers, 121 F.3d 659, 661 (11th Cir. 1997) (citing United States v. Oviedo, 525 F.2d 881, 885 (5th Cir. 1976)).[1] "In other words, the defendant's acts, taken as a whole, must strongly corroborate the required culpability; they must not be equivocal." United States v. McDowell, 705 F.2d 426, 428 (11th Cir. 1983).

I well understand that the act criminalized by 18 U.S.C. § 2422(b) is to knowingly entice (or persuade, induce or coerce) a child to engage in criminal sexual activity. The majority describes the crime as attempting to cause assent on the part of the minor, citing our holding in United States v. Murrell, 368 F.3d 1283 (11th Cir. 2004). However, I read this Court's discussion in Murrell to say more than just this. We decided that Mr. Murrell's conduct, in communicating with a fictitious parent, was "inducement rather than persuasion, enticement, or coercion," and "focus[ed] upon that component." Id. at 1287. And in discussing the definition of "inducement," we expressed "disfavor" of the following definition of

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

that term: "to lead or move by influence or persuasion; to prevail upon." Id. (citation, internal quotation marks, and alteration omitted). Instead, the panel adopted the definition "to stimulate the occurrence of; cause," and found that Mr. Murrell's negotiations with the purported father of the fictitious child were intended to stimulate the occurrence of illegal sexual conduct with that child. Id. (citation, internal quotation marks, and alteration omitted). Based upon this, I do not read Murrell to obviate the need for proof that a defendant took a substantial step towards stimulating the occurrence of his intended goal of having sex with a child.

It is also noteworthy that the district judge in Mr. Lee's case instructed the jurors that, in order to convict, they would be required to find that the government proved beyond a reasonable doubt "that the defendant intended to engage in some form of unlawful sexual activity with an individual and knowingly and willfully took some action that was a substantial step toward bringing about and engaging in the sexual activity." (Trial Tr. 486.) This was the jury charge requested by the government. (Gov't's Req. to Charge 17.) By affirming on the basis that Mr. Lee took a substantial step towards "causing assent," we uphold his conviction on grounds different from those the jury was instructed that it must find.[2]

_____

[2] Neither party referred us to the jury charge. However, we have noted in the past that when a defendant challenges the sufficiency of evidence against him, he implicitly questions the

33

In any event, and regardless of what emphasis one applies when reading 18 U.S.C. § 2422(b), the defendant in Murrell took a much more substantial step towards violating that statute than did Mr. Lee. Mr. Murrell began his internet chats with the purported parent of a 13-year-old girl on September 16, 2002. Murrell, 368 F.3d at 1284. After arranging a meeting for September 24, 2002, Mr. Murrell arrived at the designated Holiday Inn with a teddy bear, condoms, and the $300.00 he had agreed to pay for sex with the child. Id. at 1288. Mr. Lee was arrested at his home, as he went to his mailbox.

I do not press the view that travel is required for a conviction under 18 U.S.C. § 2422(b). This Court has already decided that it is not. See Yost, 479 F.3d at 820; see also United States v. Gladish, 536 F.3d 646, 649 (7th Cir. 2008). However, my review of the jurisprudence of this circuit does not reveal any defendant convicted under section 2422(b) after having made so little effort to consummate the crime.

For example, in United States v. Root, 296 F.3d 1222 (11th Cir. 2002), the defendant convicted under 18 U.S.C. § 2422(b) introduced himself to a purported 13-year-old on the internet, and three days later drove from North Carolina to the

adequacy of the district court's jury instructions. United States v. Bonavia, 927 F.2d 565, 570 (11th Cir. 1991). For this reason, this Court is permitted to, sua sponte, look to the jury charge as it relates to Mr. Lee's section 2422(b) conviction. Id.

34

Mall of Georgia to meet her at the appointed time and place. Id. at 1228. In

United States v. Yost, 479 F.3d 815 (11th Cir. 2007), the defendant convicted

under this statute found Lynn—a fictitious 13-year-old—online, and within three

days set a meeting with her at the McDonald's near her house for 9:30 a.m. the

next day. Id. at 817. Mr. Yost did not show up, but was arrested one week later,

when he arrived at the time and location of another meeting he had planned with a

second fictional child. In concluding that Mr. Yost's failure to arrive at the first

meeting was not dispositive, we quoted the Tenth Circuit for the proposition that

he had "'crossed the line from "harmless banter" to inducement the moment he

began making arrangements to meet [the minor], notwithstanding the lack of

evidence that he traveled to the supposed meeting place.'" Id. at 820 (quoting

United States v. Thomas, 410 F.3d 1235, 1246 (10th Cir. 2005)). We found that

Mr. Yost crossed that same line when he held online chats with the minor, talked to

her on the telephone, posted pictures of his genitalia, and made arrangements to

meet her at a certain time and place. Id.

Mr. Lee communicated with Candi Kane beginning on September 26, 2007

until his arrest on March 7, 2008. To the extent there was conversation about

meeting in person, the plans were never more than general talk about what could

happen in the future. Inspector Densley testified at trial that during a telephone

35

conversation on December 27, 2007, Mr. Lee said he would come ten months later, "around October," and he and Candi Kane discussed which airport would be closest. In the chats, there was nothing even as specific as that.[3] It is quite true that Mr. Lee asked for pornography; sent photographs of his genitalia; and masturbated on a webcam for the purported mother. However, I see no fact in this case demonstrating that Mr. Lee ever took any step to extend his relationship with Candi Kane or her daughters beyond the boundaries of his property in Georgia. For that reason, I do not believe there was proof that Mr. Lee took a substantial step towards enticing a child to engage in illicit sexual conduct, and I would vacate his conviction for attempting that crime.

Furthering Mr. Lee's argument—even to the limited extent I do here[4]—is

---

[3] The transcript of a December 13, 2007 chat between Mr. Lee and Candi Kane reveals that Mr. Lee typed: "Meeting is not so far fetched that it will never happen you know. I have a brother in the LA area." (Gov't Ex. C-4, at 4.) Candi Kane replied that the location was six and one-half hours from her. Id. The text of their December 21, 2007 chat shows that Mr. Lee typed: "I'm ready to make a trip[ ]out to meet you guys and talk first. I don't[ ]want their first meeting to be that of losing their virginity to me. Friends first." (Gov't Ex. C-6, at 5.) On December 26, 2007, he typed: "I want to visit you at home before we do this too. . . . Perhaps next year around this time would be good to do this or at least by the end of Oct[ober]." (Gov't Ex. C-7, at 4.) On February 26, 2008, Mr. Lee typed: "I don't know. Calif[ornia] is such a long way from here and the money is an issue right now. Perhaps over the next few months we can come up with a plan that will allow us to meet during the summer after the girls are out of school." (Gov't Ex. C-28, at 4.) In the same conversation, he wrote: "I might just fly out there and have you meet me some place. . . . I have a friend in Utah so perhaps I'll fly there then drive to visit you. Do you know how far you are from Salt Lake City?" (Id. at 5.) There were no further conversations about a meeting before Mr. Lee's arrest on March 7, 2008.

[4] As set forth by the majority, Mr. Lee was sentenced to 300 months of incarceration on each of three counts, to be served concurrently. This being the case, even if we were to reverse the section 2422(b) conviction, we would not change Mr. Lee's term of incarceration by a single

not an easy task.  His interaction with Candi Kane is disturbing, and their conversations repugnant.  I in no way intend to minimize the threat that sexual predators pose to children in our society or the life-shattering effects their actions have on their victims.  Nevertheless, I write out of concern that the majority opinion does not clearly demarcate despicable but lawful talk from a criminal attempt punishable by up to 30 years in prison.  For this reason, I respectfully dissent from the majority's decision to uphold Mr. Lee's conviction pursuant to 18 U.S.C. § 2422(b).

---

day.