[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12797

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 13, 2011
JOHN LEY
CLERK

D. C. Docket No. 07-20186-CR-MGC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHYNITA TOWNSEND,
a.k.a. Shynita Townsend-Ponton,
a.k.a. La Negra,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 13, 2011)

Before CARNES, FAY and SILER,* Circuit Judges.

_____

* Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting
by designation.

CARNES, Circuit Judge:

It has long been said that "the price of freedom is eternal vigilance,"[1] and maybe as a matter of political philosophy it is. When it comes to pretrial release from custody, however, some are willing to pay for freedom with cold hard cash, and the amount of freedom that one on supervised release has increases as the vigilance of his supervising officer decreases. In this case a drug dealer indicted on state charges who was released pending trial bought himself more freedom by bribing the officer whose duty it was to supervise his release. That officer was convicted under a statute that makes this Court's jurisdiction over the crime dependent on whether the drug dealer's freedom, or increments of it, involved "any thing of value of $5,000 or more." See 18 U.S.C. § 666(a)(1)(B).

How should we value freedom and increments of it in monetary terms? There is lyrical authority for the proposition that, "Freedom's just another word for

---

[1]The original source of the quotation is not entirely clear. Those words, or ones like them, have been attributed to Thomas Jefferson and others, but a better documented source is John Philpot Curran, an Irish lawyer and politician. In a speech given on July 10, 1790, concerning the disputed election for the mayor of Dublin, Curran said: "The condition upon which God hath given liberty to man is eternal vigilance. . . ." John Philpot Curran, "On the Right of Election of Lord Mayor of the City of Dublin," speech before the Privy Council, July 10, 1790, in Irish Eloquence: The Speeches of the Celebrated Irish Orators Philips, Curran and Grattan 15 (Philadelphia, Desilver, Thomas & Co. 1836); see also Wendell Phillips, speech in Boston, Massachusetts, January 28, 1852 in Speeches Before the Massachusetts Anti-Slavery Society, 13 (Boston, Robert F. Wallcut 1852) ("Eternal vigilance is the price of liberty.").

nothin' left to lose / And nothin' ain't worth nothin', but it's free."[2] Rejecting that view in this case, we adopt instead a non-lyrical, free-market approach that pegs the value of freedom and other intangible benefits to the price settled upon by the bribe-giver and the bribe-taker. Under that approach the value in bribes paid by a defendant on pretrial release to his supervising corrections officer in exchange for greater freedom while on release and freedom from jail does satisfy § 666(a)(1)(B)'s monetary requirement.

## I.

In June of 2003, Humberto Febles was arrested on multiple state charges including cocaine trafficking and aggravated assault with a deadly weapon, and on June 6, 2003, he was released on $500,000 bond pending trial. One condition of his release was that Febles not leave his residence for any reason, and to ensure his compliance with that condition he was required to wear a radio-frequency ankle bracelet.

On June 19, 2003, Shynita Townsend, a Miami-Dade County Corrections Officer, was assigned to monitor Febles during his pretrial release. Early on, Febles asked his former girlfriend, Carol Campbell, to request permission from Townsend for him to resume working for Campbell at his previous place of employment, Febles Nursery. After Campbell made that request of Townsend, the

---

[2] Kris Kristofferson, "Me and Bobby McGee" (Sony BMG 1971).

state court modified the terms of Febles' release to allow him to work at the nursery on July 29, 2003.

Initially, the court authorized Febles to be away from his home only from 8 a.m. to 4 p.m. for work at the nursery, with an additional 15 minutes on both ends for travel time. The modified pretrial release order required Febles to remain at home at all other times. Despite the terms of his release, Febles never actually showed up for work at the nursery. To make it look like he did, Campbell provided Townsend with pay stubs and employment verification forms for Febles through November 2003. Although Campbell eventually stopped submitting the forms, Townsend never did anything about it; she never asked about the forms or visited the nursery to verify that Febles was working there.

Instead of working at the nursery Campbell ran, Febles was working with plants of a different kind. He was tending to his several marijuana grow-houses. As is true of anyone running a booming business, Febles needed to work more than a forty-hour week, but his ability to do so was hampered by his conditions of release. In order to increase the time he could be away from the house, about a month after he was placed under her supervision Febles gave Townsend a pair of diamond earrings worth $280.00. After she received that gift, Townsend modified the terms of Febles' release to authorize him to be away from his house until 7 p.m.

4

instead of 4 p.m. Febles' self-described right-hand-man, Ramon Hernandez, later testified at Townsend's trial that after giving her the earrings Febles "could go wherever he wanted."

Even with the expanded hours of freedom he had bought with the earrings, Febles continued to routinely violate the terms of his release. And he did it with Townsend's help. For example, Febles and Hernandez took weekend trips to the Florida Keys to "party it up," and on at least one of those occasions Febles cut off his ankle bracelet and had Townsend reattach it upon his return. The log file generated by Febles' ankle bracelet shows that he remained away from his house outside of his normal work hours on several other occasions. Townsend made entries into the log file indicating that those excursions were the result of "Power Fail[ures]" or were otherwise excused or authorized.

One of Febles' excursions got him into trouble. Because he was allowed to stray from home for extended periods of time thanks to Townsend's lax supervision, Febles traveled to a tire shop in Hialeah, Florida on July 6, 2004. The tire shop was under police surveillance, and he was arrested for felony possession of a concealed weapon. In addition to committing that crime, Febles also violated the terms of his pretrial release by making that trip to the tire store without advance approval.

5

Following his arrest, Febles called Campbell to have her enlist Townsend's help in getting him out of jail, but Townsend told Campbell that she could not help if Febles was charged with a felony. According to Campbell, Townsend explained that "[s]he had to change it somehow to something to make it a misdemeanor" before she could get him out of jail. Febles instructed Campbell to work with Hernandez and offer Townsend money if she could get Febles released by midnight. Townsend later told Campbell that "she almost had it taken care of," but she "had to go above her head" and "[h]er job was on the line." According to Campbell, Hernandez instructed her to tell Townsend that she would receive $5,000 cash in a McDonald's bag if she could get Febles out by midnight.

Hernandez placed the $5,000 in a McDonald's bag along with a side of french fries and met Townsend in the parking lot of her office building, where she initially tried to refuse the bag even though Hernandez had told her it contained the cash and showed it to her. Eventually, Townsend took the cash-filled bag and Hernandez last saw her walking back to the building with it as he drove away. Febles was released later that night, and he told Campbell that Townsend was "wonderful" because "[s]he got him out." He also told Roberto Gomez, his housemate, that the "trick or prank had cost him $5,000," but "'thanks to her,' his probation had not been violated."

6

In order to ensure that Febles' bond would not be "violated," however, Townsend also had to create the illusion that his trip to Hialeah had been authorized. To that end, Townsend instructed Campbell to prepare and back-date a letter falsely stating that Campbell had sent Febles to Hialeah in order to purchase tires for the nursery's delivery van. Campbell faxed the letter to Townsend on July 7, 2004, one day after Febles' arrest, but the letter was dated a month earlier, June 5, 2004.

Unbeknownst to Febles or Townsend, law enforcement had been investigating his marijuana-growing operation since the end of 2003. Detective Carl Cooper of the Miami-Dade Police Department met with Townsend on August 17, 2004, to gather basic information about Febles including his address and the terms of his home confinement, presumably to plan a raid that would catch Febles either at home or at one of the grow-houses. On the morning of September 1, 2004, officers executed search warrants on Febles' residence and his grow-houses. When the officers learned that Febles was not at home, Detective Cooper contacted Townsend to inquire about his whereabouts. She informed the detective that she had given Febles permission to visit the driver's license bureau in Homestead, Florida, to have his driver's license renewed, but officers were unable to find any driver's license bureau at the address Townsend gave them.

According to telephone records, Townsend had spoken to Febles the day before the search warrants were executed. And on the morning of the search, after she and Detective Cooper talked, she called Febles and spoke with him for about four minutes. Febles then called Hernandez to let him know that Townsend had alerted him to the impending search. After successfully avoiding capture at his home, Febles met Hernandez and Gomez at a friend's house. Febles told Gomez "that he had received a telephone call from his probation officer telling him to leave, that the police were going to raid." Febles remained a fugitive from September 1, 2004 until February 2008 when he was killed in a drug deal in Mexico.

As part of her responsibilities as Febles' monitoring officer, Townsend was required to maintain his file, which contained a log of alerts generated by his ankle bracelet when he got out of range of the transmitter in his house. Gomez testified that, "Quite often [Febles] would call [Townsend] to give him more time and she would almost always do so." In order to cover Febles' late-night excursions, Townsend would note in the alerts log that his after-hours returns were "authorized." The entries in Febles' file also indicated that Townsend had made several visits to his home as part of her duties as his supervising officer. But Febles' roommate testified that he had only seen Townsend at the house on two

8

occasions—one time to reattach the ankle bracelet and another time when Townsend never actually entered the house but communicated with Febles from the outside using an intercom system. Other than that, he could not remember Townsend or any other corrections officer ever conducting a field visit to verify that Febles was at home.

Once a person under supervision absconds, the corrections officer is required to turn over the file to her supervisor so that it may be sealed and placed in a special file room that is off limits to regular staff, including Townsend. According to Townsend's supervisors, they were initially unable to locate Febles' file after he was placed on "abscond" status. Eventually an officer got a copy of the file from Townsend, who had kept it at her home.

In September of 2006, the Miami-Dade Police Department and the DEA executed a search warrant on Townsend's home. After the officers conducted their search, Townsend voluntarily followed them to the DEA offices where she gave a statement. During her interview, Townsend admitted that she had dictated the letter in Febles' file that purportedly authorized his trip to Hialeah and that she had instructed Campbell to back-date it. Townsend also admitted that Febles had given her the diamond earrings, which she turned over to the officers after the interview.

9

Townsend disputed Hernandez's account of what happened when he brought her the cash. As she told the story, she did not view the McDonald's bag containing $5,000 and a side of fries as a happy meal. She claimed that she twice refused to take the bag, drove into the officers' parking lot with it on top of her car, and threw it into a trash can. But when asked why she decided to take money and gifts from Febles, Townsend replied, "Greed."

Townsend was charged by a four-count superseding indictment with: (1) knowingly and corruptly accepting a thing of value (jewelry and cash) as an agent of a local government, in violation of 18 U.S.C. § 666(a)(1)(B); (2) acting as an accessory after the fact, knowing that a crime against the United States had been committed, in violation of 18 U.S.C. § 3; (3) obstruction of justice, in violation of 18 U.S.C. § 1512 (c)(1); and (4) a separate charge of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2). A jury convicted Townsend of all counts. On the second count, which charged her with being an accessory after the fact with knowledge that a crime had been committed, the jury found on a special verdict form that Townsend knew Febles had committed the offense of "giving bribes to the defendant."

The district court sentenced Townsend to concurrent sentences of 45 months on each count in addition to a two-year term of supervised release and a $400 special assessment.

## II.

Townsend contends that there was insufficient evidence to support any of her convictions. We review that issue de novo, but in doing so we resolve all reasonable inferences in favor of the jury's verdict. United States v. Lee, 603 F.3d 904, 912 (11th Cir. 2010). We will not disturb the jury's verdict unless no reasonable juror could have concluded beyond a reasonable doubt that the defendant was guilty. Id.

## III.

Townsend's sufficiency challenge to her bribery conviction focuses on whether the government proved that the value of what she provided to Febles was $5,000 or more, as required by 18 U.S.C. § 666(a)(1)(B). The statute provides that:

(a) Whoever, if the circumstance described in subsection (b)[3] of this section exists—

---

[3] Subsection (b) requires that the local government must receive $10,000 or more of federal funds in a given year for the statute to be applied. Townsend and the prosecution stipulated to this element at trial. The statute does not require a nexus between the federal funds and the transaction at issue. Sabri v. United States, 541 U.S. 600, 605, 124 S.Ct. 1941, 1945–46 (2004) (rejecting the notion that "the statute must require proof of connection with federal money as an element of the offense").

11

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

. . .

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; . . .

. . .

shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666 (emphasis added).

## A.

The supervision monitoring component of the Miami-Dade County Corrections Department, where Townsend worked, is in the business of seeing that restrictions on the freedom of pretrial releasees are enforced. The bribes were given in connection with Febles' freedom on pretrial release. The threshold question is whether intangibles, such as freedom and incremental increases in it, may be considered "any thing of value" under 18 U.S.C. § 666(a)(1)(B). The four other courts of appeals that have addressed this issue have all held that intangibles can be things of value for this purpose. See United States v. Hines, 541 F.3d 833,

12

836–37 (8th Cir. 2008) (deputy sheriff's prompt assistance in offering his services for evictions was a thing of value); United States v. Zimmermann, 509 F.3d 920, 926–27 (8th Cir. 2007) (city councilman's favorable recommendation to zoning committee was thing of value); United States v. Fernandes, 272 F.3d 938, 944 (7th Cir. 2001) (prosecutor's expungement of convictions constituted a thing of value); United States v. Zwick, 199 F.3d 672, 690 (3d Cir. 1999) (township commissioner's vote to approve permits was thing of value), abrogated on other grounds by Sabri, 541 U.S. at 604–08, 124 S.Ct. at 1945–48; United States v. Marmolejo, 89 F.3d 1185, 1191–93 (5th Cir. 1996) (holding that the plain meaning of 18 U.S.C. § 666(a)(1)(B) includes transactions involving intangibles within the term "any thing of value" and collecting cases construing "any thing of value" in other criminal statutes to include intangibles), aff'd on other grounds sub nom. Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469 (1997).  We agree with them.

As always with questions of statutory interpretation, our inquiry begins with the plain language of the statute.  See Harris v. Garner, 216 F.3d 970, 972–73 (11th Cir. 2000) (en banc).  The plain language of 18 U.S.C. § 666(a)(1)(B) requires only that the "business, transaction, or series of transactions" involve "any thing of value" worth $5,000 or more.  "The United States Supreme Court and this Court

13

have recognized on many occasions that the word 'any' is a powerful and broad word, and that it does not mean 'some' or 'all but a few,' but instead means 'all.'" Price v. Time, Inc., 416 F.3d 1327, 1336 (11th Cir. 2005). See also United States v. Alvarez-Sanchez, 511 U.S. 350, 358, 114 S.Ct. 1599, 1604 (1994); CBS, Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001); Coronado v. Bank Atl. Bancorp, Inc., 222 F.3d 1315, 1321–22 (11th Cir. 2000); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1185–86 (11th Cir. 1997). And because "Congress did not add any language limiting the breadth of that word," United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 1035 (1997), we read the term "any" in 18 U.S.C. § 666(a)(1)(B) to mean "all" things of value. Specifically, "any thing" means quite literally "any thing whatever; something, no matter what." Random House Unabridged Dictionary 96 (2d ed. 1993).

If Congress had intended to exclude intangibles from the scope of 18 U.S.C. § 666, it easily could have done so. Instead, Congress used the term "thing of value," which we have held unambiguously includes intangibles. See United States v. Moore, 525 F.3d 1033, 1048 (11th Cir. 2008) ("thing of value" in statute prohibiting bribery of public officials and witnesses unambiguously includes intangibles); United States v. Nilsen, 967 F.2d 539, 543 (11th Cir. 1992) (holding that "the phrase 'thing of value' is a clearly defined term that includes intangible

14

objectives"). And lest there be any doubt, Congress broadened the "thing of value" term even more by attaching the widening adjective "any" to it. Because the language of the statute is plain and our inquiry ends where it began, United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998), Merritt, 120 F.3d at 1185, we conclude that intangibles, such as freedom from jail and greater freedom while on pretrial release, are things of value under §666(a)(1)(B).

B.

That conclusion leads to the next question, which is how to value intangibles in deciding whether §666(a)(1)(B)'s $5,000 statutory threshold is met. The Fifth, Seventh, and Eighth Circuits have all agreed that "[w]here the bribe-giver receives an intangible benefit, . . . the bribe amount [may be used] as a proxy to stand for the value of the business or transaction." United States v. McNair, 605 F.3d 1152, 1186 n.38 (11th Cir. 2010). In United States v. Marmolejo, 89 F.3d 1185 (5th Cir. 1996), a sheriff and deputy sheriff permitted a federal prisoner in their custody to have unauthorized conjugal visits with his wife and similarly "romantic" visits with his girlfriend.[4] Id. at 1191. The Fifth Circuit determined that in deciding the value of intangible benefits for §666(a)(1)(B) purposes "courts should look to

---

[4]It was anything but free love. The prisoner paid $6,000 per month and $1,000 per visit in return for which the sheriff and deputy allowed the visits and also stood guard outside the door of the sheriff's office while the visits were taking place. Marmolejo, 89 F.3d at 1191. For what it is worth, the opinion seems to indicate that the prisoner paid the same amount for the opportunity to visit with his wife as he did to visit with his girlfriend. Id.

traditional valuation methods," and in particular, "how much a person in the market would be willing to pay" for the intangible. Id. at 1194. That was easily determined because the fact that the bribes exceeded $5,000 established that the market value of the intangibles for which the bribes were given and received also exceeded that amount. See id.

In Fernandes a prosecutor was found guilty of taking bribes in return for expunging the convictions of traffic offenders. United States v. Fernandes, 272 F.3d 938, 944 (7th Cir. 2001). The Seventh Circuit found that §666(a)(1)(B)'s value requirement was met because the total amount of the bribes taken by the prosecutor exceeded $5,000. Id. And in Zimmerman, the Eighth Circuit determined that no additional inquiry was necessary as to one of the counts of conviction because the amount of the bribe under that count was $5,000. United States v. Zimmermann, 509 F.3d 920, 926 (8th Cir. 2007).

We agree that the market approach is a valid method for determining the value of an intangible obtained through bribery. Under this approach, the value of an intangible in the black market of corruption is set at the monetary value of what a willing bribe-giver gives and what a willing bribe-taker takes in exchange for the intangible. "As we have stated, the conduct and expectations of a defendant can establish whether an intangible objective is a 'thing of value.'" Nilsen, 967 F.2d at

16

543. It is but a small extension of that principle to recognize that the conduct of the bribed defendant and her briber may establish the value of the intangible thing of value.

The value of the market value approach is that it does not require courts to struggle with putting a price on an intangible. The parties do it themselves. In this case, the evidence was more than sufficient for the jury to find, as it did, that Townsend and Febles priced her intervention on behalf of him and the greater freedom he gained as a result of it at more than $5,000. The price of the earrings was $280, and there was $5,000 cash in the McDonald's bag for a total of $5,280. That is enough to meet §666(a)(1)(B)'s jurisdiction threshold of "$5,000 or more."

IV.

Townsend also contends that her conviction for acting as an accessory after the fact should be vacated because there was no evidence that she warned Febles that his home and grow-houses were about to be searched. Under 18 U.S.C. § 3, "Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." 18 U.S.C. § 3. The jury returned a special verdict form specifying that Febles' crime for which Townsend had been an accessory after the fact was "giving bribes to Defendant."

17

The evidence supporting Townsend's conviction for bribery also proved that Febles had committed the "offense against the United States" of giving bribes to Townsend. Townsend unquestionably had knowledge of Febles' bribery offense because she is the one who received the bribes. The only remaining issue, then, is whether there was sufficient evidence that Townsend assisted Febles in avoiding apprehension, trial, or punishment. See 18 U.S.C. § 3.

Townsend insists that all the evidence about the accessory charge shows is that she contacted Febles on the day of the searches shortly after she was contacted by Detective Cooper, and she failed to inform the detective about her conversation with Febles. Townsend points out that there were no recordings of the conversations to establish what, if anything, she said to Febles. And a warning from her was not the only way that Febles could have become aware of the investigation. Gomez admitted on cross-examination to having told a DEA agent that Hernandez had said at one point that he would have a friend's brother find out if warrants had been issued for their arrest.

There was enough evidence to support the jury's finding that Townsend did help Febles avoid apprehension. The evidence showed that Townsend became aware of an investigation targeting Febles at least as early as August 17, 2004, when she met with Detective Cooper to discuss Febles' schedule and other

18

information. Although she told the detective that Febles had permission to go to a driver's license bureau in Homestead, Florida, a DEA agent testified that no such bureau existed at the address she provided. Telephone records showed that Townsend spoke with Febles both on the day before the searches were conducted, and again shortly after Detective Cooper called her to ask about Febles' whereabouts the morning the searches were going to be conducted. Febles also called Hernandez that morning to warn him about the searches and told him that "La Negra called me." Several witnesses testified that Febles often referred to Townsend as "La Negra." And Gomez testified that later that day Febles told him "that he had received a telephone call from his probation officer telling him to leave, that the police were going to raid." The government also introduced testimony that Febles would have been arrested if he had been home on the day of the searches. Given all of the evidence, we cannot say that no reasonable juror could have concluded beyond a reasonable doubt that Townsend acted as an accessory after the fact, as charged in the indictment. See United States v. Lee, 603 F.3d at 912.

V.

Townsend also attacks her conviction for obstruction of justice under 18 U.S.C. § 1512(c)(1), which provides:

19

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding . . .

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512.

Townsend contends that the government's evidence that she made false entries in a copy of Febles' file was insufficient to prove that she destroyed, altered, or mutilated the original file. As witnesses testified, files on absconded fugitives were placed in a locked file cabinet, but after Febles absconded to Mexico authorities were unable to locate his original file during their investigation of Townsend. Most of the evidence on this charge concerned the copy of Febles' file that had remained in Townsend's possession until she turned it over to law enforcement officials during their investigation of her.

The court's instructions to the jury specifically required the jury to find that "the defendant altered, destroyed, mutilated or concealed the original Miami-Dade County Corrections and Rehabilitation Department file of Umberto Febles or attempted to do so." (emphasis added). In the course of its deliberations, the jury asked the court whether the government's evidence that Townsend falsified entries

20

in her copy of the file combined with the fact that the original was never found could be considered evidence that she had altered the original file.[5]  The court responded by directing the jury to re-read its instructions pertaining to Count Three; those instructions clearly required the jury to find that Townsend had altered the original file before it could convict her.[6]  We presume that juries follow the instructions that they are given, which means that the jury did find that Townsend altered, destroyed, mutilated, or concealed the original file.  See Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S. Ct. 1965, 1976 n.9 (1985) ("[W]e adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.").  The fact that Townsend had the only

---

[5] The jury asked the court: "All of us agree that Townsend altered, destroyed, mutilated or concealed documents.  However, can we consider the copies given to us as evidence [of] the original document?  Do we base our decision on the evidence because we have never seen the original?"

[6] The court responded:

   As to the first part of your question, I would ask that you look at the instructions appearing, that begin on page 15, page 15, and the second element: That the defendant altered, destroyed, mutilated or concealed the original Miami-Dade County Corrections and Rehabilitation Department file on Humberto Febles, or attempted to do so.

   And the third element: That the defendant altered, destroyed, mutilated or concealed the original MDCR file on Humberto Febles, or attempted to do so with the intent to impair the object's integrity and availability for use in an official proceeding.

remaining copy of the file and had altered it as part of the bribery scheme is strong circumstantial evidence that she is the one who got rid of the original file. Again, we cannot say that no reasonable juror could have concluded beyond a reasonable doubt that she altered, destroyed, mutilated, or concealed the original file. See United States v. Lee, 603 F.3d at 912.

VI.

Townsend's second conviction for obstruction of justice was charged in Count Four under subsection (c)(2) of § 1512, which provides that:

(c) Whoever corruptly–

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c)(2).

This count of the superseding indictment did not specify precisely how Townsend obstructed justice under subsection (c)(2) of the statute.[7] She assumes

---

[7] Count Four of the indictment charged that:

From on or about September 1, 2004, and continuing to April 28, 2005, the exact dates being unknown to the Grand Jury . . . the defendant . . . did corruptly obstruct, influence, and impede any official proceeding, and attempted to do so; in violation of Title 18, United States Code, Section 1512(c)(2).

22

that the charge was based on her presentation of the falsified copy of Febles' file in place of the original. Based on that assumption, she argues that the government failed to produce any evidence that she intended to obstruct, influence, or impede an official proceeding by producing the falsified copy because at that time she had no knowledge that she was being investigated.

Even assuming, as Townsend argues, that the evidence concerning Febles' file cannot support her Count Four conviction for obstruction, there was still enough other evidence from which the jury could have found beyond a reasonable doubt that Townsend obstructed justice by impeding an official proceeding. The charge was broad enough to encompass Townsend's telephone calls warning Febles that search warrants were about to be executed on his home and grow-houses. The government argued that basis for this charge in its closing arguments to the jury. The court's instructions to the jury permitted the jury to base a conviction under this count on Townsend's warning calls to Febles.[8] She did not

---

[8] The district court's instruction to the jury as to Count Four provided that:

Under Count 4 the defendant can be found guilty of that offense only if all the following facts are proved beyond a reasonable doubt[:]

First, that there was an official proceeding, that is, a criminal investigation of federal offenses involving Umberto Febles and others[;]

Second, that the defendant engaged in conduct which constituted a substantial step towards the commission of the crime of obstruction of an official proceeding[;]
Third, that the defendant acted corruptly[;]

23

object to those instructions when they were given, and she has not attempted to challenge them before this Court.

The evidence presented at trial showed that Townsend was aware of the investigation into Febles' marijuana enterprise, and that she spoke to Febles on the phone just before the searches took place, and that when the authorities asked where to find Febles she sent them to a phony address, and that Febles told others that Townsend had warned him that the searches were about to take place. In light of that evidence, the jury reasonably could have found beyond a reasonable doubt that all of the elements of the offense existed: (1) that the narcotics investigation targeting Febles was an official proceeding; (2) that Townsend warned Febles of the searches, thereby obstructing or impeding that investigation; (3) that Townsend acted corruptly in light of the timing of her phone calls to Febles and the apparently fabricated reason she gave for Febles' absence — that he was at a non-existent driver's license bureau; and (4) that the natural and probable effect of her warning to Febles was interference with the due administration of justice.

**AFFIRMED**.

---

Four that the natural and probable effect of the defendant's conduct would be the interference with the due administration of justice.

24