[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-14002

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROMEO VALENTIN SANCHEZ,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:17-cr-00136-SPC-MRM-1

_____

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

After a five-day trial, a jury found Romeo Valentin Sanchez guilty of seven counts involving sex crimes against minors. The district court sentenced him to his guidelines sentence of life imprisonment plus a consecutive ten-year mandatory minimum. That consecutive part of his sentence was based on his conviction for committing a felony crime involving a minor while he was already registered as a sex offender.

He challenges the denial of his motion to suppress evidence obtained from his two cell phones. He also raises various challenges to his sentence. None of his challenges has merit.

## I.

In March 2017 a woman contacted the Cape Coral, Florida police and reported that her twenty-nine-year-old former boyfriend, Romeo Sanchez, was having sex with her little sister CP, who was 14 years old.[1]

## A.

The family had begun to suspect that something was wrong when CP received a late-night call on her cell phone while the family was watching a movie at home. Her father answered and told

---

[1] This minor victim is referred to in the record by three initials, but to further protect her identity we have shortened it to two.

the caller that the phone belonged to a fourteen-year-old, who shouldn't be getting late-night calls. The next day, CP's family took her phone and discovered that Sanchez had been the late-night caller.

They also discovered pornographic photographs and videos of CP that she had sent to Sanchez. CP admitted to her family she had been communicating with him through several social media applications and at his request had sent him nude photographs and videos of herself. She also admitted that they had sex.

After CP's family informed the police about what was happening, a detective went to their house to investigate and to seize her phone as evidence. As part of the investigation, the detective interviewed a neighbor who said that he had seen CP leaving her house in the night and getting picked up by someone driving a Ford Mustang. That was the kind of car that Sanchez drove.

CP was interviewed at the Children's Advocacy Center. She said Sanchez had asked her to send him nude pictures of herself using the "Kik" messenger app, and she had complied with his request. She also had agreed to meet him at her house to have sex while her parents weren't home. Sanchez came to her house at about 9:00 at night. She lost her virginity to him. She said that the sex was painful, and that Sanchez had ejaculated on her face.

Over the next seven months, Sanchez used various apps to ask on a daily basis for CP to send him pornographic images of herself. She complied by sending him pictures of her breasts, vagina,

and buttocks.  He also asked her to record and send nude videos of herself, specifying various acts he wanted the videos to depict.  She complied.  Sanchez asked her to record herself inserting a toothbrush into her vagina.  When she told him that it would be painful, he replied, "I like seeing you in pain."  She complied and sent him the video.  During the time he was requesting and receiving child pornography from CP, Sanchez sent her two photographs of his penis, but he instructed her to delete those photos, and she complied.

During her Children's Advocacy Center interview, CP described other occasions when she and Sanchez had sex.  She recounted that each time they had sex, he ejaculated on her face, in her mouth, or on her breasts.  He told her not to tell anyone about them having sex or he would go to jail.  One conversation that CP had with a friend indicated that Sanchez had impregnated CP and that her parents would be angry when they found out.  But CP miscarried.

Detectives searched CP's cell phone and the social media apps on it and found that she had "friends" named "romeo Valentine" and "romeo2magic."  Under each name, they found images of CP's breasts and face that had been sent to Sanchez.  They also found evidence that she had sent sexually explicit images to "other males," and she admitted that she had done so.

The search of CP's phone revealed that on February 26, 2017, she had sent a Snapchat message to Sanchez, trying to end their "relationship," and telling him that he made her feel like "a

whore where you put your dick." Sanchez responded by sending her his cell phone number. Phone records showed there were incoming calls and text messages from Sanchez on CP's phone.

The subscriber information for the social media applications that CP had used to communicate with Sanchez showed that they were associated with an internet protocol address registered to Sanchez's residence. That address matched the one for his Florida driver's license and for his registration on the State Sexual Offender Registry. He was on the registry because in 2011, while serving in the Air Force, he had an Article 120 military conviction for indecent conduct. It involved his sending over the internet photos of his exposed penis and of a woman's bare breasts and buttocks to a 13-year-old girl.

As part of their investigation, detectives conducted a controlled call between CP and Sanchez. After she and Sanchez exchanged greetings, she told him that her parents had found out about their relationship. After that, "Sanchez changed his tone, appearing to be confused, claiming he believed the call was from someone else." He ended the call.

The next day, Detectives Hicks and Mino, Sergeant Kaye, and Officer Mills from the Cape Coral Police Department went to Sanchez's house with a warrant to seize his phone. (We'll call it Phone 1 to distinguish it from the second phone, which we'll call Phone 2, that officers seized later when they arrested Sanchez at the restaurant where he worked.) Sanchez came out to the driveway to speak with the officers. He told them he lived at the house

with his parents, admitted that he had dated CP's older sister (although he said he knew her by a different name), but he denied having had sex with CP. He denied nearly everything they asked about CP, including having spoken with her during the controlled call. He said "everyone" had access to his phone, and he didn't lock it. The detectives told Sanchez that, based on their investigation, they thought he was lying to them.

Sanchez asked if he was being arrested, and Detective Hicks said no. Sanchez asked if he needed to get a lawyer, and Hicks said he could not give legal advice. The detectives showed Sanchez a copy of the search warrant for Phone 1. When he questioned the electronic signature of the judge, the detectives told him that the warrant was valid and that they were there to seize the phone. Detective Hicks said they were going to arrest Sanchez if he didn't turn over the phone. Sanchez replied, "I'm fine giving you my phone."

Sanchez "grabbed at his pocket," causing Detective Hicks to think that he might have a weapon or try to "wipe" evidence from the phone; he patted Sanchez's pocket to see if there was a weapon or the phone in it. There wasn't.

While Sanchez was speaking with the detectives, his parents returned home. Sergeant Kaye approached them and told them that their son was being questioned as part of an investigation. Later, they came over to where the detectives were speaking with Sanchez. At that point, Sanchez and the detectives were discussing the warrant for seizing the phone, and Sergeant Kaye proposed that

Sanchez's parents get the phone. Sanchez said that his parents knew where the phone was located and said it was in his room. A transcript of the interview shows that an unidentified officer said: "So let's just grab that one," referring to the phone, "and we'll — I'll go in with you [Sanchez's mother]. That way nobody gets all nervous when you go in the house."

Sergeant Kaye later testified that Sanchez's mother had agreed to get the phone from the house, and he went in with her to get it. The sergeant didn't recall whether her consent was verbal or nonverbal, but he testified that he would not have entered the house without her permission. The district court found his testimony was credible.

Sergeant Kaye testified that he accompanied Sanchez's mother to get the phone "for safety purposes and to ensure that the phone was not tampered with." She led him to an unlocked bedroom where the phone was located, and he could not recall who picked up the phone, but they were in the home just a few minutes, and after they had retrieved the phone, the officers left. They did not arrest Sanchez at that time.

A forensic search of Phone 1 revealed 27 calls between Sanchez and CP, ranging in length from three seconds to four hours. Forensic examinations of CP's and Sanchez's phones uncovered chat conversations about their sexual relationship as well as nude images and videos of CP that she had sent Sanchez. There was a total of 18 videos of CP, each one less than 10 seconds long. Some of the 18 videos depicted the young girl inserting a

toothbrush into her vagina, inserting a curling iron into her vagina, grabbing her breasts, and other acts of that sort. One video had a "text bar" that said, "I hate videos."

A few months after the officers seized Phone 1, Detective Hicks and another officer, who was wearing a body camera, arrested Sanchez at his workplace, Carrabba's Italian Grill. When Sanchez retreated to a back room as they came in, they followed him. He tried to conceal his phone (Phone 2) in the kitchen and said it belonged to the restaurant, but after verifying that the restaurant didn't provide Sanchez with a phone, the detective seized it.

**B.**

The search of Phone 2 produced evidence of another child-victim, AP, a 14-year-old girl with whom Sanchez had communicated through the Kik messenger application.[2] There were pornographic images of her that AP had sent to Sanchez using the app, including an image of AP lifting her shirt and exposing her breasts. The username that had received the messages was "thatboygian," purportedly "Gian King," a 13-year-old Asian boy. But it was actually Sanchez using a fake identity to communicate with AP.

The conversations on Phone 2 between AP and Sanchez (posing as Gian King) started late on the night of May 26, 2017,

---

[2] Like CP, the minor victim AP is referred to in the record by three initials, and to further protect her identity, we have shortened it to two. AP is not related to CP.

which was *after* the officers had come to Sanchez's house and told him about the investigation involving CP and had seized Phone 1. In conversations over the course of a few days, Romeo Sanchez (posing as Gian King) told AP that "Romeo" told him she was "cool," and that she wanted to talk to him (Gian).   "Gian" asked her to send him sexually explicit videos, and she complied. Sanchez (as the fictitious 13-year-old Gian) said he wanted to take her virginity.  He also said that because he had a small penis, he wanted AP to have sexual intercourse with Sanchez instead of him so that she would be "satisfied."  He asked her to record a video showing "everything," and she complied.  Sanchez (as Gian) said he liked to watch someone "he loves" having sex with another man and urged AP to have sex with Sanchez because "he is trusted." Later that afternoon, Sanchez (as himself) exchanged messages with AP, and she complained about "Gian King" and said Gian had acted "inappropriate."  Sanchez apologized for trying to set them up.

On July 14, 2017, about a month after Sanchez's arrest and the search of Phone 2, detectives met with AP and her family at their home.  AP identified herself in the photos from Sanchez's Phone 2.  She said that she had met Sanchez on May 14, 2017, when she and her family dined at Carrabba's where he was their server. Sanchez, who had a mobile nail service, offered to paint AP's and her family's nails at their home, and the family agreed.  He came to their home and did their nails on May 25, 2017, which was the day before Sanchez' communications (as Gian King) began with

AP.  AP's parents agreed to let the detectives seize her phone, and they did.

AP was later interviewed at the Children's Advocacy Center. She disclosed that she had told Sanchez that she was attracted to men with Asian or Korean appearance, and he had suggested that she contact a family friend of Asian descent, "Gian King."  The day after he painted AP's family's nails, he convinced AP to download "What'sApp" and provided a screen name for "Gian."  AP's phone and Sanchez's phone combined contained six photos and two videos of her engaged in sexual conduct; the videos were each less than 13 seconds long.  AP never had sex with Sanchez.

## C.

A grand jury returned a seven-count superseding indictment against Sanchez.  It charged him with two counts of enticing a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (count one for CP and count four for AP); two counts of enticing a minor to engage in sexually explicit conduct in order to produce child pornography, in violation of 18 U.S.C. § 2251(a) (count two for CP and count five for AP); two counts of possessing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) (count three involving Phone 1 and count six involving Phone 2); and one count of having committed a felony offense involving a minor while already a registered sex offender, in violation of 18 U.S.C. § 2260A (count seven).

Sanchez filed a motion to suppress the following evidence: (1) all evidence obtained from the warrantless "searches [of] his home," including the cellular phone seized inside the house (Phone 1); (2) all evidence obtained from the search of the phone seized at the time of his arrest at the restaurant where he worked (Phone 2); and (3) any and all statements made to the detectives who came to his house.[3]  Sanchez argued that although the officers had a warrant to search Phone 1, they had no warrant to search his home, and their warrantless entry into the home violated the Fourth Amendment.  He also argued that they had obtained a warrant to search Phone 2 based on the evidence they uncovered in their search of Phone 1.  As a result, he asserted that the evidence recovered from the search of Phone 2 was fruit of the poisonous Phone 1 tree.

The government responded that seizure of Phone 1 was justified by consent and exigent circumstances.  It alternatively argued that even without Phone 1's evidence, the warrant to search Phone 2 was supported by probable cause.

The district court held an evidentiary hearing.  The government called two witnesses: Detective Hicks and Sergeant Kaye.  After their testimony, the court heard arguments from both sides.  It later issued an order denying the motion to suppress.  The court

---

[3] In his briefs to this Court, Sanchez did not argue that his statements to the detectives should be suppressed, so he has abandoned that argument.  *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).

found that Sergeant Kaye had consent from Sanchez's mother to enter the home to retrieve Phone 1. The court noted that it didn't have to reach the government's exigent circumstances argument, but even so, it found:

> [A] reasonable, experienced officer had legitimate reason to fear evidence on Phone 1 would be destroyed by wiping, remote or otherwise, before securing a search warrant for Sanchez's home. Such fear is because Sanchez (1) was not in custody, (2) told the Detectives that his phone was not locked and everyone had access to it, (3) knew about the Detectives investigating his sexual relationship with [CP]; (4) knew the Detectives had a warrant for Phone 1, and (5) had been previously convicted of a crime for inappropriate contact with a minor.

On the issue of consent, the court credited Sergeant Kaye's testimony that Sanchez's mother agreed to allow him to enter the home for the limited purpose of seizing the phone, which is what he did. The court explained:

> At one point, Sanchez's parents approached the garage area where the Detectives were meeting with their son. At that time, the Detectives were speaking to Sanchez about Phone 1. Sergeant Kaye suggested that Sanchez's parents get the phone. Sanchez said that the phone was in his room. Sergeant Kaye testified that Sanchez's mother affirmatively agreed to get the phone. His testimony, while lacking in the specifics of how Sanchez's mother consented, was

uncontroverted and credible. He never wavered in his testimony that she consented to the search and that he would not have entered the residence without first obtaining consent. He followed Sanchez's mother inside and into an unlocked bedroom. Once the phone was retrieved from the bedroom, Sergeant Kaye and Sanchez's mother exited the residence. The entire search took minutes.

There is no evidence of intimidation or coercion; Sanchez's mother was not under arrest or threatened. A reasonable officer standing in Sergeant Kaye's shoes would have believed that Sanchez's mother could enter her residence and retrieve the phone. When Sergeant Kaye asked Sanchez's mother to retrieve the phone, she never stated that she did not have access to the home, the unlocked bedroom, or the phone. Nor did Sanchez or his father indicate that she did not have permission to retrieve Phone 1. In fact, Sanchez told them where it was.

The search was limited in scope. Sergeant Kaye followed Sanchez's mother into the home to obtain the phone and did not deviate from that consent. The only item retrieved was Phone 1. Based on a review of the totality of the circumstances, the Court finds that Sanchez's mother gave Sergeant Kaye voluntary consent.

The district court rejected Sanchez's argument that the search warrant for Phone 2 was tainted because it was based in part on the evidence found in Phone 1. The court concluded that

because the seizure and search of Phone 1 was lawful, and that evidence was used to secure a valid warrant to seize and search Phone 2, Sanchez's argument failed.

After the jury found Sanchez guilty on all seven charges against him, he was sentenced to life imprisonment plus a consecutive ten-year mandatory minimum.  He appeals the denial of his motion to suppress and raises four sentence-related challenges. We will first address whether the district court erred by not excluding evidence derived from the officer's brief, warrantless entry into Sanchez's home for the sole purpose of seizing a phone that he agreed to turn over to law enforcement.

## II.

"A district court's ruling on a motion to suppress presents mixed questions of law and fact." *United States v. Ramirez-Chilel*, 289 F.3d 744, 748–49 (11th Cir. 2002).  We must accept the district court's fact findings as true unless they are clearly erroneous, but we review *de novo* its application of the law to the facts. *Id.* at 749. A district court's credibility determination gets special deference, and we accept it "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.* (quotation marks omitted); *see also United States v. Castaneda*, 997 F.3d 1318, 1325 (11th Cir. 2021).

Sanchez contends that the government did not meet its burden of proving that Sergeant Kaye had consent to conduct a "search" of his home because the sergeant was "unable to identify

the consent" that his mother provided, by which he means exactly how she consented for him to go in with her. Sanchez also contends that because the search for and seizure of Phone 1 in the house was unlawful, the resulting seizure of Phone 2 and the evidence obtained from the search of it was fruit of the poisonous tree that must be suppressed. Cf. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (explaining that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of" unconstitutional searches).

"A warrantless entry into a suspect's home to search the premises is presumed to be unreasonable." *Ramirez-Chilel*, 289 F.3d at 751. Which means only that the government has the burden of proving that the defendant gave his free and voluntary consent to the search. See *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir. 1987).

Sanchez himself verbally consented to the seizure of Phone 1 in the house. He told the officers he was "fine" with giving them his phone and that his parents knew where it was and that it was in his room. After he said that, his mother gave Sergeant Kaye at least nonverbal consent to follow her into the home to retrieve the phone. And both Sanchez's and his mother's consent was freely and voluntarily given. There was no show of force causing either of them to acquiesce to a show of authority. Nor did the officers arrive in the middle of the night to conduct a search, which we've recognized can be a factor indicating coercion. Cf. *Ramirez-Chilel*, 289 F.3d at 751 & n.8 ("Nighttime searches are deemed to be more

intrusive than daytime searches, and the assemblage of law enforcement officers at one's door in the middle of the night has a tendency to be more coercive than during the day.")

We've repeatedly made it clear that consent can be non-verbal; stepping aside and "'yielding the right-of-way'" to officers at the front door is valid consent to enter and search. *Id.* at 752; *Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 525–26 (11th Cir. 2019). Likewise, silently accepting an officer's expressed intent to enter the house solely for the purpose of retrieving a phone is also valid consent. Especially when the owner of the phone, who is a co-occupant of the house, has already verbally consented to turning it over (pursuant to a valid warrant) and has told the officers which room it is in. All of these circumstances add up to voluntary consent. *See United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (explaining that a determination about whether a person's consent to search was voluntary depends on the specific facts and is based on the "totality of the circumstances"). The district court did not err in finding that there was valid consent for Sergeant Kaye to enter the house for the sole purpose of retrieving Phone 1, which is what he did and all that he did.

Because the search for and seizure of Phone 1 was valid, the search for and seizure of Phone 2 was not tainted. No poisonous tree, no poisonous fruit.

**III.**

Sanchez also raises several challenges to his sentence. First, he contends that his previous conviction under Article 120 of the Uniform Code of Military Justice should not be classified as a qualifying offense under 18 U.S.C. § 2251(e), which triggered a 25-year mandatory minimum sentence of imprisonment. If he were correct about that, for his § 2251 convictions he would have been subject to a mandatory minimum of 15 years instead of 25 years, and to a maximum of 30 years instead of 50 years. But his position is not correct because its central premise is that the statute doesn't really mean what it clearly says.

Sanchez's § 2251 convictions result from his conduct inducing minors (CP and AP) to engage in sexual activity for the purpose of producing a "visual depiction" of that activity. The relevant part of the penalty provision of the statute sets a 25-year mandatory minimum sentence and a maximum of 50 years for violators who already have certain listed convictions. A conviction under Article 120 of the Uniform Code of Military Justice is on that list, plain as day:

> Any individual who violates . . . [§ 2251] shall be fined under this title and imprisoned not less than 15 years nor more than 30 years, but if such person has one prior conviction under this chapter, section 1591, chapter 71, chapter 109A, or chapter 117, *or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice)*, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex

> trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 25 years nor more than 50 years . . . .

18 U.S.C. § 2251(e) (emphasis added).  The district court concluded that the 25-year mandatory minimum applied to Sanchez because it was undisputed that he had a prior conviction under section 920 of title 10 (Article 120 of the Uniform Code of Military Justice), and the plain language of § 2251(e) required the 25-year minimum sentence.  As the district court said, "The statute here is clear."

Sanchez raises arguments about congressional intent, earlier versions of the statute, the rule of lenity, and the absurdity doctrine.  He asserts that his prior conviction for "an indecent act" should not trigger a 25-year mandatory minimum for his current § 2251 convictions.  He insists that it would be absurd to apply § 2251(e)'s 25-year mandatory minimum to what he calls "minor sexual indiscretions" because "today's definition of Article 120 includes the crimes of rape, sexual assault, aggravated sexual contact, and abusive sexual conduct, all of which arise to more serious offenses than those falling under indecent acts."  Reply Brief of Appellant at 12.

Sanchez's congressional intent argument is based on amendments to § 2251 and Article 120 of the Uniform Code of Military Justice.  He points out that § 2251 was amended in 2003 to include a prior conviction under Article 120 as a trigger for higher § 2251

penalties. *See* PROTECT Act, Pub. L. No. 108–21, § 507, 117 Stat. 650, 683 (2003).    At that time, Article 120 covered what he describes as "serious sexual offenses," such as rape.  In 2006, however, Article 120 was amended to add, among other things, the crime of an "indecent act." *See* National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109–163, § 552(a)(1)(k), 119 Stat. 3136, 3258 (providing that "[a]ny person subject to this chapter who engages in indecent conduct is guilty of an indecent act and shall be punished as a court-martial may direct").  Article 120 no longer includes that provision. *See* 10 U.S.C. § 920 (2019) (criminalizing rape and sexual assault).  As a result, Sanchez argues that Congress could not possibly have intended to include his conviction for an indecent act as an Article 120 conviction that would trigger an enhanced penalty under § 2251.  The gist of his argument is that there was only a brief period during which his conduct would have triggered the § 2251 enhanced penalty; he does not dispute that his conduct occurred during that period.

Sanchez was convicted under Article 120 in 2011 because he sent pornographic photos of his exposed penis and of a woman's bare breasts and buttocks to a 13-year-old girl.  That conviction required Sanchez to register as a sex offender.  His conduct was far from what he describes as a "minor sexual indiscretion."  In any event, the particulars of his sex crime against a child, which violated Article 120, are not essential to the application of § 2251(e).

"As always with questions of statutory interpretation, our inquiry begins with the plain language of the statute." *United*

*States v. Townsend*, 630 F.3d 1003, 1010 (11th Cir. 2011). And when the language of the statute is plain, "our inquiry ends where it began." *Id.* at 1011. It ends there because "we must presume that Congress said what it meant and meant what it said." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (quotation marks omitted). Section 2251(e) requires the application of a 25-year mandatory minimum sentence if a defendant has a prior conviction under Article 120. Congress said that, Congress couldn't have been any plainer about that, and we presume Congress meant that. It is undisputed that Sanchez has a prior conviction under Article 120 and that he had it at the time he violated § 2251. The 25-year mandatory minimum and the 50-year statutory maximum apply, and the district court did not err in its application of § 2251(e).

Sanchez's arguments about lenity and absurdity do not alter that result. The rule of lenity cannot override the clear directive of a statute. *See Salinas v. United States*, 522 U.S. 52, 66 (1997) (explaining that the rule of lenity "does not apply when a statute is unambiguous"); *Mulhall v. Unite Here Loc. 355*, 667 F.3d 1211, 1216 (11th Cir. 2012). And there is nothing absurd about the application of § 2251(e)'s plain directive setting Sanchez's mandatory minimum sentence based on his prior conviction under Article 120. *See Logan v. United States*, 552 U.S. 23, 36 (2007) ("Statutory terms . . . may be interpreted against their literal meaning where the words could not conceivably have been intended to apply to the case at hand.") (quotation marks omitted); *see also Crooks v.*

*Harrelson*, 282 U.S. 55, 60 (1930) (explaining that the judicially created absurdity doctrine will be "applied to override the literal terms of a statute only under rare and exceptional circumstances").

## IV.

Sanchez also challenges four guidelines sentencing enhancements. One of them is the application of a 4-level increase under U.S.S.G. § 2G2.1(b)(4) for production of child pornography that portrays sadistic or masochistic conduct. The district court applied that enhancement because Sanchez had CP make videos of herself inserting foreign objects into her vagina. He argues that he did not appear in the videos and that an objective viewer would not believe that the pictured activity had inflicted physical pain, emotional suffering, or humiliation on CP.

But CP told Sanchez that inserting the toothbrush would be painful, to which he responded that he "like[d] seeing [her] in pain." Which at least implicitly acknowledged it would be painful. An objective viewer could reasonably find that it was painful and humiliating. *See United States v. Caro*, 309 F.3d 1348, 1351–52 (11th Cir. 2002) (holding that the sadistic conduct enhancement applied when the images showed penetration that would be painful, including vaginal and anal penetration with foreign objects); *see also United States v. Turchen*, 187 F.3d 735, 739 (7th Cir. 1999) (explaining that "sadistic and masochistic conduct includes sexual gratification which is purposefully degrading and humiliating"); *United States v. Starr*, 533 F.3d 985, 1001 (8th Cir. 2008) (holding that a minor's "self-penetration by a foreign object" justifies application

of the enhancement); *United States v. Johnson*, 784 F.3d 1070, 1075 (7th Cir. 2015) (holding that "an image of a young girl inserting a screwdriver into her vagina connotes a degree of potential pain and violence" justifying application of § 2G2.1(b)(4)). The district court did not err in applying the § 2G2.1(b)(4) enhancement.

Sanchez also challenges a 2-level increase he received under § 2G2.1(b)(2)(A) for production of child pornography that involved committing "a sexual act or sexual contact." He argues that he did not touch, penetrate, or film the two victims, and their masturbation does not amount to a sexual act or sexual contact within the meaning of the guidelines provision. Yes it does. *United States v. Shafer*, 573 F.3d 267, 278 (6th Cir. 2009) (upholding application of the § 2G2.1(b)(2)(A) enhancement where the defendant persuaded the young victim to "to self-masturbate"); *see also United States v. Aldrich*, 566 F.3d 976, 979 (11th Cir. 2009) ("[W]e conclude as the district court did that the plain meaning of 'sexual contact' under U.S.S.G. § 2G2.1(b)(2)(A) and 18 U.S.C. § 2246(3) includes the act of masturbating. The statute's operative phrase 'any person' applies to all persons, including [the defendant] himself."); *accord United States v. Pawlowski*, 682 F.3d 205, 212 (3d Cir. 2012); *United States v. Raiburn*, 20 F.4th 416, 422 (8th Cir. 2021) ("Following our sister circuits, we reject [the defendant's] arguments and hold that the plain meaning of 'sexual contact' under U.S.S.G. § 2G2.1(b)(2)(A) and 18 U.S.C. § 2246(3) includes the act of masturbating.") (quotation marks omitted).

Sanchez also challenges a 5-level increase he received under U.S.S.G. § 4B1.5(b)(1) for "engag[ing] in a pattern of activity involving prohibited sexual conduct." He certainly did that. He sent messages to CP for months, requesting sexual images from her on a daily basis. The district court found that 29-year-old Sanchez had a "sexual relationship" with 14-year-old CP, and her testimony that she had sex with Sanchez on several occasions was credible. We give that credibility finding "great deference." *United States v. Clay*, 376 F.3d 1296, 1302 (11th Cir. 2004).

And when the court applied the § 4B1.5(b) enhancement, it explained: "Most troublesome in this case is that after the police confiscated Mr. Sanchez's cell phone while investigating him for the relationship with [CP] he bought a new cell phone and started contacting yet another victim [AP]. To the Court, this is certainly a pattern of a repeat and dangerous predatory conduct towards minors."

And there's more. The fact that Sanchez produced child pornography on two separate occasions means that the pattern enhancement applies. *See United States v. Isaac*, 987 F.3d 980, 994 (11th Cir. 2021) (explaining that a pattern is "at least two separate occasions" that need not occur "during the course of the offense" or "involve[] the same minor") (quoting U.S.S.G. § 4B1.5 cmt. n.4(B)(i) and U.S.S.G. § 2G2.2 cmt. 1). The district court properly applied the 5-level § 4B1.5(b)(1) increase.

Finally, Sanchez challenges a 2-level increase that was imposed under § 2G2.1(b)(3) for knowingly engaging in the

distribution of child pornography.  He argues that his solicitation of child pornography from the victims is not distribution, and he didn't distribute that pornography after he received it from them. Even if the application of that enhancement was error, it was harmless because Sanchez's total offense level would have remained the same regardless.  *See United States v. Sarras*, 575 F.3d 1191, 1220 n.39 (11th Cir. 2009) (explaining that when the total offense level remains unchanged, any error is harmless).  Here's why.

Sanchez scored a total offense level of 51.  The highest offense level from the guidelines sentencing table that counts in sentencing is 43, and as a result 43 became Sanchez's countable offense level.  *See* U.S.S.G. Ch. 5, Pt. A, cmt. n.2 (explaining that "[a]n offense level of more than 43 is to be treated as an offense level of 43"); *Isaac*, 987 F.3d at 987.  A total scored offense level of 51 minus 8 enhancement levels is 43.  Any error in the district court's application of the guidelines would have to reduce the scored offense level by more than 8 to be anything other than harmless because with any reduction of 8 levels or fewer, the countable offense level would remain the same: 43.  If the 2-level increase that was imposed under § 2G2.1(b)(3) was erroneous, subtracting it would have reduced the total scored offense level to 49, but the countable offense level would have remained at 43.  As a result, any error in applying a 2-level enhancement under § 2G2.1(b)(3) was harmless. *See Sarras*, 575 F.3d at 1220 n.39.

Sanchez has shown no reversible error in any of his guide-lines calculations based on the enhancements that the district court applied.

## V.

Sanchez contends that his rights under the Double Jeopardy Clause were violated because he was sentenced for violating both 18 U.S.C. § 2251 and § 2422 based on his criminal conduct of enticing the two minors to produce child pornography. He argues that he should not have been sentenced for both crimes because they have identical elements. No, they don't.

The Double Jeopardy Clause guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The protections it affords include a prohibition against "multiple punishments for the same offense." *United States v. Bobb*, 577 F.3d 1366, 1371 (11th Cir. 2009). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). That's the *Blockburger* test, a/k/a the "same-elements test." *Bobb*, 577 F.3d at 1374. When applying that test, we focus "on the proof necessary to establish the statutory elements of each offense, not the actual evidence presented at trial." *Id.* at 1372; *see also United States v.*

*Lee*, — F.4th —, No. 20-13505, 2022 WL 829014, at *3 (11th Cir. Mar. 21, 2022) ("This strictly elemental analysis applies even where we are presented with two offenses based on the same factual allegations.") (quotation marks omitted). We look at whether the two statutes have the same elements. *See Bobb*, 577 F.3d at 1372, 1374.

They don't, as the Sixth Circuit has held. It rejected a similar double jeopardy challenge to sentences under § 2422 and § 2251 because the elements of the statutes are different:

> Here, 18 U.S.C. § 2422(b) requires the government to prove that [the defendant] attempted to persuade a minor to engage in "sexual activity for which any person can be charged with a criminal offense." This element is not found in 18 U.S.C. § 2251. And § 2251 requires the government to prove that [the defendant] attempted to persuade a minor to engage in sexually explicit conduct "for the purpose of producing any visual depiction of such conduct." This element is not contained in 18 U.S.C. § 2422(b). Because 18 U.S.C. §§ 2422(b) and 2251 each require proof of an element that the other does not, [the defendant's] double jeopardy argument fails.

*United States v. Hart*, 635 F.3d 850, 858 (6th Cir. 2011); *see also United States v. Isabella*, 918 F.3d 816, 849 n.28 (10th Cir. 2019) (rejecting the defendant's argument that the "'activity for which any person can be charged with a criminal offense' under § 2422(b) was the same activity [that formed the basis of] his conviction under § 2251(a)" because the elements of the statutes differed).

We agree.  The statutes have some different elements.  They pass the *Blockburger* test.  Sanchez's double jeopardy argument fails.

## VI.

Finally, Sanchez contends that his guidelines-range life sentence (plus a 10-year consecutive mandatory minimum one) is substantively unreasonable.  He argues that it would have been enough to impose the mandatory minimum sentence of 35 years (25 years on the child pornography production counts plus 10 years consecutive on count 7, the felony offense involving a minor while he was already registered as a sex offender).  Sanchez points to the sentence hearing testimony of defense witness psychologist Dr. Imhof.  He testified to his opinion that Sanchez's risk of recidivism would be greatly reduced after he served a 35-year sentence, at which time Sanchez would be in his mid-sixties.  Sanchez also argues that "the court unreasonably placed no weight on the many, many mitigating factors here — that [he] served his country in the United States Air Force, which included deployments overseas; [his] vulnerability in prison; and no evidence of intent to actually distribute the images sent to him."

We review the reasonableness of a sentence only for abuse of discretion.  *United States v. Irey*, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc).  We will "vacate the sentence if, but only if,

we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (quotation marks omitted).

The district court did not improperly weigh the factors or commit a clear error of judgment. *See id.* The court stated that it had taken into account the § 3553(a) factors and mitigating facts, such as Sanchez's consistent employment history, his military service, and Dr. Imhof's testimony that Sanchez suffers from bipolar disorder and depression. The court considered a lower sentence but decided it would not be appropriate under the circumstances.

At the sentence hearing, the court explained in detail its findings and conclusion about the appropriate sentence. In weighing the § 3553(a) factors, the court considered the fact that Sanchez was already a registered sex offender when he committed the seven crimes for which he had most recently been convicted in this case. It noted that after his prior sex offense crime, which he committed while he was in the military, he was "confined" and was "sentenced to treatment." A problem was, as the court found, that "[c]learly, the treatment that [Sanchez] received did not alleviate the urges that [he] regularly experienced in regard to contact that [he] had with minors." The court pointed out that Sanchez's own witness, Dr. Imhof, stated that the prior conviction "was a shot over the bow, but [Sanchez] didn't get the message." He failed to get the

message, the court found, even after his prior confinement and treatment.

Instead of getting the message, the court said, Sanchez "sought" CP as one of his victims and even "befriended her family." The court had heard testimony from CP during the trial that Sanchez had sex with the fourteen-year-old girl on multiple occasions. At sentencing, the court spoke directly to Sanchez:

> By [CP's] own admission, she was a shy, insecure 14-year-old. During the course of the offense, you not only took her virginity, but you took her dignity as well in all of the messages you sent her, the barrage of phone calls, of contact, of sexual contact with her. And all through that, when confronted during the course of the search warrant you continued to deny any allegations that she made against you. In fact, during the controlled call you acted like you didn't even know her, her family or her sister. And you continued to lie to law enforcement about all of those contacts.

The court found it "[p]articularly troubling" that after law enforcement seized Sanchez's phone, he "still didn't stop." Instead, he "sought another victim." It appeared that he was "always looking for another victim, always looking for another conquest."

To that end, the court explained, after law enforcement took Sanchez's phone, he got another one and found another young victim by preying on a family who came to eat at the restaurant where he worked. About the crimes he had committed against that other

child victim, AP, the court said that Sanchez "demand[ed]" that the girl "send [him] photographs of herself, repeatedly, constantly texting her, sending messages," all the while pretending that he was a 13-year-old boy.  The court wondered how Sanchez "kept up with the barrage of text messages, changing [him]self and [his] identity from [13-year-old fictional] Gian King to [him]self and then texting [AP]."  The court said it "barely could keep up" while "reading the messages, and [Sanchez was] changing [his] identity after every text."  Even when he was arrested, the court pointed out, Sanchez tried to hide his phone, which was the "second phone that [he] got after [his] first phone was confiscated."  The district court explained that it had considered both the mitigating factors and the fact that again and again Sanchez was undeterred in his conduct of committing sex crimes against children.

In light of all those considerations, the court imposed the guidelines sentence of life imprisonment plus a consecutive ten-year mandatory minimum, which was required because Sanchez had committed felony crimes involving minors while he was already registered as a sex offender.

"We've upheld time and again sentences that will outlast a child pornographer's life."  *Isaac*, 987 F.3d at 996 (citing four decisions that also cite others).  And the life sentence here was within the guidelines range.  *See id.* at 994 ("Though we don't automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect it to be.") (quotation marks omitted).  The

19-14002                Opinion of the Court                31

district court did not abuse its discretion.  The sentence it imposed on Sanchez is not substantively unreasonable.

**AFFIRMED.**